# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| In re:<br><br>NORTH AMERICAN<br>REFRACTORIES COMPANY, *et al.*,<br><br><br><br>Debtors. | Proceedings for a<br>Reorganization under Chapter 11<br><br>Case No. 02-20198<br><br>Jointly Administered<br><br>Related to Document No. 3889, 4846,<br>5321 and 5456. |
| In re:<br><br>GLOBAL INDUSTRIAL<br>TECHNOLOGIES, INC., *et al.*,<br><br><br>Debtors. | Proceedings for a<br>Reorganization under Chapter 11<br><br>Case No. 02-21626<br><br>Jointly Administered<br><br>Related to Document No. 5427, 6869, 6870,<br>6873, 6875, 7091, 7185, 7186, 7188 and 7822. |

**REVISED MEMORANDUM OPINION\* ON CONFIRMATION OF THIRD AMENDED PLAN OF REORGANIZATION FOR NORTH AMERICAN REFRACTORIES COMPANY, ET AL. DATED DECEMBER 28, 2005 AND THIRD AMENDED PLAN OF REORGANIZATION FOR GLOBAL INDUSTRIAL TECHNOLOGIES, INC., ET AL. DATED DECEMBER 28, 2005 AS SUPPLEMENTED[1]**

---

\* This Revised Memorandum Opinion supersedes any other Memorandum Opinion regarding the confirmation of the Debtors' Plans previously issued by this court.

[1] The court's jurisdiction was not an issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

# TABLE OF CONTENTS

I.      Introduction ................................................................................................ 4

II.     Background .................................................................................................. 8

     A.      RHI AG .............................................................................................. 8

     B.      North American Refractories Company .......................................... 9

     C.      NARCO/Honeywell Relationship ................................................... 10

     D.      Global Industrial Technologies, Inc. ............................................ 11

     E.      A.P. Green Industries, Inc. ............................................................ 12

     F.      Chapter 11 Cases ............................................................................ 13

III.    Overruling of Objecting Insurers' Objections to Confirmation of GIT Plan ..................... 14

     A.      Analysis ........................................................................................... 20

          1.      APG Silica Trust and Silica Channeling Injunction ................... 20

               a.      Necessity to the reorganization. ....................................... 22

                    i.      Number of Current and Future Silica Claims. ................... 22

                    ii.     Economic Burden of Silica Claims .................................... 29

               b.      Fairness. ................................................................................ 36

          2.      December 15, 2006, Amendment ............................................. 37

IV.     Overruling of Certain Objections to Confirmation ................................ 43

V.      Findings of Fact and Conclusions of Law ............................................. 44

     A.      Modifications by the Court to Debtors' Proposed Findings of Fact and Conclusions of Law ...................................................... 44

          1. Modifications that Incorporate the Amendments to the APG Silica Trust ........................................................................ 44

          2. Modifications that Update the Voting Tabulation on the GIT Plan Subsequent to the Amendment ................................ 47

3. Modification that Clarifies Issues Relating to the APG Silica
Channeling Injunction......................................................................................49

4. Additional Conclusions of Law Regarding Certain Insurance
Settlements by Certain of the GIT Debtors.................................................49

5. Adoption of Certain Findings of Fact and Conclusions of Law Without
Modification..................................................................................................51

VI.    Conclusion .................................................................................................................51

## I. **Introduction**

The matters before the court are the confirmation of:

    A.    The Third Amended Plan of Reorganization dated December 28, 2005 of North American Refractories Company, *et al.* [2] ("NARCO"), as amended, modified, or supplemented by:

1. Modification to the Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries filed June 21, 2006;

2. Proposed Directors, Trustees and Trust Advisory Committee Members filed June 21, 2006;

3. Notice of Proposed Initial Trustees filed May 17, 2007;

4. Supplement to North American Refractories Company, *et al.* Protected Parties filed October 1, 2007; and

5. October 25, 2007 Technical Amendments to Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries filed October 25, 2007

(collectively the "NARCO Plan")[3]; and

---

[2] NARCO-Affiliated Debtors: I-Tee Holding Corp. ("I-Tec"), filed January 4, 2002, Case No. 02-20200; InterTec Company ("InterTec") filed January 4, 2002, Case No. 02-20199; and Tri-Star Refractories, Inc. ("Tri-Star"), filed January 29, 2002, Case No. 02-20979.

[3] *See* NARCO Case No. 02-20198, Doc. Nos. 3889 (December 28, 2005 Plan documents) (subsequent references to NARCO docket will be shortened to "NARCO Doc. No."), 4454 (June 21, 2006 Proposed Modifications), 4455 (June 21, 2006 Notice of Proposed Directors, Trustees and Trust Advisory Committee Members), 5420 (Notice of Supplement to NARCO Protected Parties), and 5451 (October 25, 2007 Technical Plan Amendments).

B.     The Third Amended Plan of Reorganization dated December 28, 2005 of Global

Industrial Technologies, Inc., *et al.*[4] ("GIT," and collectively with NARCO, the "Debtors"), as

amended, modified, or supplemented by:

1.    Modification to the Third Amended Plans of Reorganization Dated
      December 28, 2005 of North American Refractories Company and Its
      Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries
      filed June 21, 2006;

2.    Proposed Directors, Trustees and Trust Advisory Committee Members
      filed June 21, 2006;

3.    Amendment dated December 15, 2006 to Third Amended Plan of
      Reorganization Dated December 28, 2005 of Global Industrial
      Technologies, Inc. and its subsidiaries filed December 15, 2006;

4.    Amendment to Third Amended Plan of Reorganization of Global
      Industrial Technologies, Inc. and Its Subsidiaries filed January 30, 2007;

5.    Supplement to Global Industrial Technologies, Inc., *et al.* Protected
      Parties filed October 1, 2007; and

6.    October 25, 2007 Technical Amendments to Third Amended Plans of
      Reorganization Dated December 28, 2005 of North American Refractories
      Company and Its Subsidiaries and Global Industrial Technologies, Inc.
      and Its Subsidiaries filed October 25, 2007

---

[4]     GIT Affiliated-Debtors: Harbison-Walker Refractories Company ("H-W"), Case No. 02-21627;
Indresco International, Ltd. ("Indresco International"), Case No. 02-21628; Harbison-Walker Refractories Europe,
Ltd. ("H-W Europe"), Case No. 02-21629; Harbison-Walker International Refractories, Inc. ("H-W International"),
Case No. 02-21630; Global Industrial Technologies Service Company ("GIT Services"), Case No. 02-21631; GPX
Corp, ("GPX"), Case No. 02-21632; GIX Foreign Sales Corp. ("GIX"), Case No. 02-21633; Global Processing
Systems, Inc. ("GPS"), Case No. 02-21634; TMPSC, Inc.("TMPSC"), Case No. 02-21635; GPX Forge, Inc. ("GPX
Forge"), Case No. 02-21636; GPX Forge-Acquisition, Inc. ("GPX Acquisition"), Case No, 02-21637; GPX Forge-
U, Inc. ("GPX Forge-U"), Case No. 02-21638; A.P. Green Industries, Inc. ("APG"), Case No. 02-21637; A.P. Green
Services, Inc. ("APG Services"), Case No. 02-21640; A.P. Green Development Corp. ("APG Development"), Case
No. 02-21641; Detrick Refractory Fibers, Inc. ("Detrick"), Case No. 02-21642; A.P. Green Refractories Corporation
("APG Refractories"), Case No. 02-21649; Intogreen Co. ("Intogreen") Case No. 02-21650; A.P. Green
International, Inc.("APG International"), Case No. 02-21652; Lanxide ThermoComposites ("Lanxide"), Case No.
02-21653; Chiam Technologies, Inc. ("Chiam"), Case no. 02-21654; RHI Refractories Americas, Inc. ("RHI
Refractories Americas""), Case No, 02-21980; ANH Refractories Company, formerly known as RHI Services, Inc.
("ANH"), Case No. 02-23042; and RHI America Receivables Corporation ("RHI Receivables"), Case No. 02-
23043.

(collectively the "GIT Plan").[5]  Confirmation hearings were conducted on June 5-6, 2006,

October 26-27, 2006, November 17, 2006, and March 16, 2007.

The NARCO Plan is uncontested.  All objections to the NARCO Plan raised by parties

with standing[6] have been resolved and/or withdrawn on a consensual basis.[7]  All objections to

---

[5]  GIT Case No. 02-21626, Doc. Nos. 5427 (December 28, 2005 Plan documents) (subsequent references to GIT docket will be shortened to "GIT Doc. No."), 6244 (June 21, 2006 Proposed Modifications), 6245 (June 21, 2006 Notice of Proposed Directors, Trustees and Trust Advisory Committee Members), 6969 (Amendment Dated December 15, 2006), 7091 (January 30, 2007 amendment), 7765 (Notice of Supplement to GIT Protected Parties), and 7819 (October 25, 2007 Technical Plan Amendments).

[6]  Hartford filed Preliminary Objections to confirmation of the NARCO Plan on March 15, 2006. NARCO Doc. No. 4144. NARCO and Honeywell International Inc. ("Honeywell") filed a joint motion to strike Hartford's Preliminary Objections, based on Hartford's lack of standing. NARCO Doc. No. 4172. After full briefing and argument, this court concluded that Hartford had no standing to object to the proposed NARCO Plan. Transcript of April 25, 2006, Omnibus Hearing, NARCO Doc. No. 4321, at 52-53; Order on Motion to Strike Certain Preliminary Objections to Debtors' Proposed Third Amended Plan of Reorganization, NARCO Doc. No. 4428. Hartford later submitted Notice Relating to Proposed Plan of Reorganization which sought to apprise the court as to recent cases as they pertained to confirmation of the NARCO Plan. NARCO Doc. No. 5013. Debtors filed a motion to strike, citing the no standing order. NARCO Doc. No. 5057. Hartford responded by arguing that its brief could be deemed to be an *amicus curiae* submission. NARCO Doc. No. 5098. This court entered an order granting the motion to strike, stating that the "court is aware of the two opinions cited by Hartford and the 'notice' is superfluous in that regard". Order dated May 16, 2007, NARCO Doc. No. 5144.

[7]  At the time of the May 31, 2006, hearing, the only remaining objection to the NARCO Plan was raised by National Union Fire Insurance Company of Pittsburgh, Pa., and "any other entities related to American International Group, Inc. that engaged in business transactions with the Reorganizing Debtors" regarding the two-year window for contingent claims to become fixed or liquidated as required by Section 3.4.1 of the NARCO Plan. *See* May 31, 2006, Hearing Transcript, NARCO Doc. No. 4432, at 31 and 45. *See also* Objection of National Union Fire Insurance Company of Pittsburgh, Pa. and Related Companies to Confirmation of the Third Amended Plan Dated December 28, 2005, of North American Refractories, *et al.*, NARCO Doc. No. 4339, at ¶9. At the June 5, 2006, Confirmation Hearing, this court encouraged the parties to work toward a settlement regarding this issue. *See* Transcript of June 5, 2006, Hearing, NARCO Doc. No. 4434, at 288-91. National Union notified the court at the June 29, 2006, Omnibus hearing that it had reached an agreement with Debtors, subject to any objections regarding the final language of the settlement. *See* June 29, 2006, Hearing Transcript, NARCO Doc. No. 4499, at 21,22.

On December 15, 2006, NARCO filed a motion for an Order approving a settlement between NARCO and the AIG Member Companies as set forth in the "Settlement Agreement Between the ANH Companies and AIG Member Companies" which resolved the remaining objection to the NARCO Plan. See Motion for an Order Approving Settlement Agreement Between Debtors ANH Companies and AIG Member Companies, NARCO Doc. No. 4846. On May 4, 2006, this court entered an order approving the settlement agreement. The order authorized the parties to the settlement agreement to execute documents and instruments and take steps necessary or appropriate to consummate and implement the settlement agreement. However, nothing was entered on the docket or on the record to confirm that the settlement agreement was signed and executed. On August 14, 2007, this court entered an order instructing the parties, within 10 days, to file the executed settlement agreement or a stipulation that the agreement was not entered and that the aforementioned objection was still outstanding. *See* Order Regarding Settlement Agreement Between Debtors ANH Companies and AIG Member Companies, NARCO Doc. No. 5321. On August 17, 2007, NARCO filed a Certification of Counsel Regarding Settlement Agreement Between Debtor NARCO and

Continued on following page

the confirmation of the GIT Plan but those addressed herein have been resolved. The remaining opposition[8] to confirmation of the GIT Plan comes from certain insurance companies ("Objecting Insurers")[9] that engaged in insurance transactions with GIT.[10] Objecting Insurers assert that the APG Silica Trust ("Silica Trust") and the corresponding APG Silica Channeling Injunction ("Silica Channeling Injunction") included in the GIT Plan are neither necessary nor appropriate under § 105 of the Bankruptcy Code for GIT's successful reorganization. Additionally, two objections were filed by AIG Member Companies and Hartford in opposition to the Amendment, alleging that the expansion of the class of claimants covered by the Silica

---

Continued from previous page

Its Subsidiaries and Affiliates and the AIG Member Companies with a copy of the fully executed settlement agreement attached. See NARCO Doc. No. 5326; GIT Doc. No. 7620. The executed settlement agreement contains a provision resolving the objections to Section 3.4.1 of the NARCO plan, stating: "The AIG Member Companies shall not be required to submit any present or future Contingent Claim(s), as defined in the PORs [Plans of Reorganization], for Reimbursables associated with an AIG Insurance Policy to the Bankruptcy Court for purposes of estimation and allowance pursuant to §502(c) of the Bankruptcy Code as set forth in Section 3.4.1 of the PORs and the Contingent Claims for such Reimbursable shall not be subject to any limitations period established under the PORs to become fixed or liquidated." NARCO Doc. No. 5326, Exh. A, §5.

    8    Other issues have been resolved, leaving only objections to the silica trust. *See e.g.*, Order Approving Settlement Agreement Between Debtors ANH Companies and AIG Members Companies, GIT Doc. No. 7359, and Settlement Agreement, GIT Doc. No. 6963, Exh. A. (resolved all AIG Member Companies' objections to the GIT Plan except for the objections relating to the Silica Trust). "The settlement agreement resolves the objections raised by the AIG Member Companies to the Plans of Reorganization except for their objection relating to the creation of the APG Silica Trust under the GIT Plan of Reorganization." Motion for an Order Approving Settlement Agreement Between Debtors ANH Companies and AIG Member Companies, GIT Doc. No. 6963, at 3.

    9    The "Objecting Insurers" were Hartford Accident & Indemnity Company, First State Insurance Company, and Twin City Fire Insurance Company (collectively "Hartford"); National Union Fire Insurance Company of Pittsburgh, Pa. and any other entities related to American International Group, Inc. that engaged in insurance transactions with Debtors (collectively, the "AIG Member Companies"); Century Indemnity Company as successor to CIGNA Specialty Company, formerly known as California Union Insurance Company, and Westchester Fire Insurance Company, for itself and for International Insurance Company now known as TIG Insurance Company (collectively "California Union"); and Lumbermans Mutual Casualty Company and its American insurance Affiliates (collectively "Kemper"). By separate Memorandum Order, this court granted Debtor's motion to strike the Plan Objections of all Objecting Insurers other than AIG Member Companies and Kemper. *See* GIT Doc. No. 7703.

    10    The Bankruptcy Code provides that "[a] party in interest may object to confirmation of a plan." 11 U.S.C. §1128. The term "party in interest" is undefined in the Bankruptcy Code but includes "all persons whose pecuniary interests are directly affected by the bankruptcy proceedings" or who otherwise have a stake in the outcome. *See Yadkin Valley Bank & Trust Co. v. McGee (In re Hutchinson)*, 5 F.3d 750, 756 (4th Cir. 1993).

Trust resulted in improper classification under 11 U.S.C. §1122 and §1127 and inequitable treatment of similarly situated claims under 11 U.S.C. §1123(a)(4) and §524(g).

For the reasons expressed in detail below, this court finds that the APG Silica Trust and Silica Channeling Injunction are necessary for successful reorganization of GIT and that the classification of claimants established by the Amendment is reasonable and appropriate. Thus, Objecting Insurers' objections to the plans will be overruled. The court will address its findings of fact and conclusions of law as to confirmation of the NARCO and GIT plans, as set forth below, and based thereon, this court finds that the NARCO and GIT plans are confirmable under 11 U.S.C. §1129 and that the channeling injunctions should be issued as addressed therein regarding asbestos claims under §524(g) and regarding GIT silica claims under §105 and §1123(b)(6). Although the injunction regarding silica must be addressed under §105, the extent to which the APG Silica Trust and APG Silica Injunction also satisfy the standards set forth in §524(g) will be addressed in the Findings of Fact and Conclusions of Law attached as Exhibit 1.

## II. Background

### A. RHI AG

North American Refractories Company ("NARCO"), Harbison-Walker Refractories Companies ("H-W") and APG (formerly known as A.P. Green Refractories Company) historically were competitors in the refractory industry.[11] In 1995, RHI AG, an Austrian company, acquired NARCO. On December 31, 1999, a subsidiary of RHI AG acquired GIT,

---

[11] Refractory products are construction-type materials specifically designed and manufactured for use in high-temperature applications, including use in metal-melting furnaces, boilers, and ladles. May 19, 2006, Declaration of Donald Abrino, NARCO Doc. No. 4358, ¶ 5.

which owned H-W and APG along with other miscellaneous businesses and companies.[12] RHI Refractories Holding Company is the immediate corporate parent of NARCO and GIT, but is not a debtor in either the NARCO or GIT bankruptcy cases.

## B.    North American Refractories Company

NARCO is an Ohio corporation that manufactures and sells refractory products.[13] NARCO was incorporated in 1928 in Delaware.  In 1968, NARCO merged with Eltra Corporation.[14] Allied Chemical Corporation, a predecessor to Honeywell International Inc. ("Honeywell"), acquired Eltra Corporation in 1979.[15]  In early 1986, Allied Chemical sold the NARCO business to the then NARCO entity, NARCO Investors, Inc.[16]  In 1991, that NARCO entity merged with Didier-Taylor Refractories Corporation, and the merged entity changed its name to North American Refractories Company.[17]  Through a series of subsequent transactions, NARCO became, and on the Filing Date was, an indirect wholly owned subsidiary of RHI AG. NARCO is the parent of three Affiliated Debtors: Tri-Star, InterTec, and I-Tec.[18]  NARCO is also currently the parent of Zircoa, Inc., which did not file a petition for relief under Chapter 11 and continues to operate without Bankruptcy Court protection.[19]

---

[12]    May 23, 2006, Declaration of Jon A. Allegretti, GIT Doc. No. 6028, ¶ 4.

[13]    May 19, 2006, Declaration of Peter M. Kreindler, NARCO Doc. No. 4354, ¶ 8 (hereinafter "Kreindler Decl,"); May 19, 2006, Declaration of Michael D. Heintzman, NARCO Doc. No. 4353, ¶ 25 (hereinafter "Heintzman Decl.").

[14]    *Id.*

[15]    Kreindler Decl., NARCO Doc. No. 4354, ¶ 10,12; Heintzman Decl., ¶ 25.

[16]    Kreindler Decl., NARCO Doc. No. 4354, ¶ 11.

[17]    Disclosure Statement, NARCO Doc. No. 3888, at 19.

[18]    *Id.*

[19]    *Id.*

## C. NARCO/Honeywell Relationship

The assets of the unincorporated NARCO division of Allied Corporation (now named Honeywell, and hereinafter referred to as such) were acquired by the debtor NARCO's predecessor, NARCO Investors, Inc., through a Purchase Agreement consummated on January 17, 1986, which contained mutual indemnity obligations running between NARCO and Honeywell.[20] Specifically, NARCO assumed (and agreed to indemnify Honeywell for) all of the NARCO Product Line's product liabilities, except those liabilities that arose from "Discontinued Products."[21] Honeywell retained (and agreed to indemnify NARCO for) liability for defending and resolving claims arising from "Discontinued Products."[22] The term "Discontinued Products" was defined in the Purchase Agreement as products not substantially similar to products manufactured, distributed or sold by NARCO after January 17, 1986.[23] However, almost immediately after the transaction was consummated, the parties disagreed on which products were "Discontinued Products."[24]

Both NARCO and Honeywell agree that it is impossible, as a practical matter, to determine which of them is responsible for the existing NARCO Asbestos Trust Claims and for any such future claims.[25] To determine, as between them, who is responsible for a given claim requires answers to two questions: (1) To what specific product (including the date and place of

---

[20] Kreindler Decl., NARCO Doc. No. 4354, ¶ **11**, 16-17.

[21] *Id.*, ¶ 18,19.

[22] *Id.*, ¶ 18,19.

[23] *Id.*, ¶ 19.

[24] *Id.*, ¶ 21.

[25] Kreindler Decl., NARCO Doc. No. 4354, ¶ 23; May 19, 2006 Declaration of Donald Abrino, NARCO Doc. No. 4358, ¶ 8.

manufacture) does the claimant contend he or she was exposed? (2) Is that product a "Discontinued Product"?[26] Because asbestos claimants rarely, if ever, identify the NARCO product at issue with any specificity, the parties can almost never start the analysis.[27] Moreover, determining which of the NARCO Product Line's 1,800 products is or is not a "Discontinued Product" would be a laborious, time-intensive and extremely contentious effort.[28]

Therefore, pursuant to the NARCO/Honeywell Settlement Agreement,[29] Honeywell has agreed to fund the NARCO Asbestos Trust, as reflected in the NARCO Asbestos Trust Agreement, in exchange for a §524(g)(4) and/or a §105(a) injunction,[30] channeling all asbestos personal injury and indirect asbestos claims arising in any way out of the NARCO Product Line to the NARCO Asbestos Trust.[31]

### D. Global Industrial Technologies, Inc.

In 1992 DII Industries, LLC ("DII") spun off to its shareholders several businesses and operations, including Harbison-Walker Refractories Division.[32] In order to accomplish that transaction, DII placed the business units to be spun off into Dresser Finance Corporation, a

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *See* Motion for an Order Authorizing the Debtor's Execution of an Acknowledgment and Release, Relating to the Settlement Agreement Between Honeywell International, Inc. and Federal Insurance Company, NARCO Doc. No. 1208, Exh. 1; Order Authorizing the Debtor's Execution of an Acknowledgment and Release Relating to the Settlement Agreement Between Honeywell International, Inc. and Federal Insurance Company, NARCO Doc. No. 1296.

[30] Although Honeywell would fund the NARCO Asbestos Trust in exchange for a §524(g)(4) or § 105(a) injunction, the injunction will be issued only pursuant to §524(g)(4) in accord with the opinion of the Court of Appeals in *In re Combustion Engineering Inc.*, 391 F.3d 190 (3d Cir. 2004).

[31] Disclosure Statement, NARCO Doc. No. 3888, at 24.

wholly owned Subsidiary of DII.[33] DII later changed the name of Dresser Finance Corporation to Indresco, Inc., and spun off Indresco, Inc. to the DII shareholders[34]. In November of 1995, GIT was formed as a publicly traded holding company for Indresco, Inc. and its subsidiaries.[35] Between 1995 and 1998, through a series of acquisitions and divestitures, GIT pursued a strategy of growing and developing its perceived core refractory business while disposing of non-core businesses.[36] GIT's most significant acquisition was of APG in 1998.[37] GIT was acquired by a subsidiary of RHI AG in 1999.[38] GIT's principal business is as a holding company for Harbison-Walker Refractories Company ("H-W") and APG.[39]

### E.    A.P. Green Industries, Inc.

APG was initially incorporated in 1915 as a Missouri corporation operating under the name of A.P. Green Fire Brick Company.[40] APG operated independently until its merger with U.S. Gypsum Corporation ("U.S. Gypsum") in 1967, when it became a wholly-owned subsidiary of U.S. Gypsum.[41] As part of a U.S. Gypsum plan of reorganization approved in 1987, the stock of APG was distributed to stockholders of U.S. Gypsum. APG operated as a publicly-owned

---

Continued from previous page

[32]    *Id.*, at 27.

[33]    *Id.*

[34]    *Id.*

[35]    *Id.*

[36]    *Id.*

[37]    *Id.*

[38]    *Id.*

[39]    *Id.*

[40]    Disclosure Statement, NARCO Doc. No. 3888, at 33.

[41]    *Id.*

company until it was acquired by GIT in 1998.[42] APG is a wholly-owned subsidiary of GIT and serves as a holding company for various subsidiaries, including the following Debtors: APG Services, APG Development, APG Refractories, Detrick, APG International, and APG Green Refractories.[43]

### F.     Chapter 11 Cases

On January 4, 2002, the NARCO entities commenced their bankruptcy cases under Chapter 11 of the Bankruptcy Code. On February 14, 2002, the GIT entities commenced their bankruptcy cases under Chapter 11 of the Bankruptcy Code. All Debtors are jointly administered. All estates of the NARCO-related debtors are jointly administered as are all estates of the GIT-related Debtors.[44]

The NARCO Plan and the GIT Plan were both filed on December 28, 2005,[45] along with the Combined Disclosure Statement to Accompany Third Amended Plan of Reorganization dated December 28, 2005, of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries (the "Disclosure Statement").[46]

NARCO's creditors voted overwhelmingly in favor of the NARCO Plan and its treatment of claims in March of 2006.[47] NARCO Class 2 (DIP Financing Claim) voted in favor of the

---

[42]   May 23, 2006 Declaration of Jon A. Allegretti, GIT Doc. No. 6028, ¶ 55.

[43]   Disclosure Statement, NARCO Doc. No. 3888, at 33.

[44]   *See* Order Directing Joint Administration of Related Chapter 11 Cases, NARCO Doc. No. 30; GIT Doc. No. 29.

[45]   NARCO Doc. No. 3889; GIT Doc. Nos. 5294.

[46]   NARCO Doc. No. 3888; GIT Doc. No. 5293.

[47]   Declaration of Kathleen M. Logan Certifying Voting on and Tabulation of Ballots Accepting and Rejecting the Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories

Continued on following page

NARCO Plan 100 percent in number and in value of claims held, NARCO Class 3-A (General Unsecured Claims) voted in favor of the plan 99.03 percent in number and 99.60 percent in value of claims held, and NARCO Class 4-A (NARCO Asbestos Trust Claims) voted in favor of the plan 95.85 percent in number and 93.15 percent in value of claims held.[48] GIT Plan voting results are provided and discussed below.

### III.   Overruling of Objecting Insurers' Objections to Confirmation of GIT Plan

As of the Petition Date, APG was defending approximately 169 "silica only" claims (claims alleging only silica-related personal injury caused by exposure to an APG product) in a Texas state court. None of these claims had been resolved or settled by APG prior to the Petition Date.[49] However, prepetition, the Travelers Indemnity Company, Travelers Casualty & Surety Company (f/k/a The Aetna Casualty and Surety Company), and the United States Fidelity & Guaranty Company (collectively "Travelers") authorized the settlement of six silica cases against APG for $65,000 and spent $243,531 defending 17 silica lawsuits against APG.[50] Thus, prior to filing this bankruptcy, GIT had limited history dealing with silica claims. The bankruptcy filing

---

Continued from previous page

Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries (the "Plans"), NARCO Doc. No. 4254.

[48]   *Id.*

[49]   Allegretti Declaration, GIT Doc. No. 6028, ¶ 63.

[50]   Oct. 17, 2006, Revised Supplemental Expert Report of Kevin Nystrom, GIT Doc. No. 6741, ¶20, Stipulation Regarding Defense Costs Associated With Silica-Related Claims Against Debtors, Debtors' Confirmation Hearing Ex. 63.

stayed the filing of new silica claims against GIT. Nonetheless, 5,125 individuals[51] asserted

current silica claims against APG in ballots cast on the GIT Plan.[52]

The GIT Plan, as filed on December 28, 2005, provided for the establishment of the

Silica Trust and Silica Channeling Injunction. Pursuant to an agreement among several of the

major constituencies in this case, the APG Silica Trust initially was to be funded by $31.5

million in cash from certain insurance settlements (as described in agreements previously

approved by this court),[53] and through an assignment of the right to insurance coverage for silica-

related liabilities under certain non-settled insurance policies issued to certain GIT Debtors. The

APG Silica Trust is to be administered, and the silica-related claims are to be processed, in

accordance with the APG Silica Trust Agreement and the APG Silica Trust Distribution

Procedures ("Silica TDP").[54]

In accordance with this court's January 30, 2006, voting procedures order,[55] GIT solicited

the approval of the GIT Plan from creditors and claimants. All classes of creditors

---

[51]   Later, 489 ballots were withdrawn, leaving 4636 to be addressed. *See* note 76, *infra*.

[52]   Oct. 18, 2006, Supplemental Declaration Of Kathleen M. Logan Related to Tabulation of Ballots Accepting and Rejecting the Third Amended Plan, Debtors Confirmation Hearing Ex. 77, GIT Doc. No. 6750.

[53]   The initial $31.5 million in proceeds from the APG Settlement Fund consisted of (a) 6% of the proceeds of APG and APG Services' settlements with Continental Insurance Company, Federal Insurance Company and Great American Insurance Company; (b) 50% of the amount that has been recovered pursuant to the settlement of the APG KWELM Policies; (c) 50% of the amount that has been recovered from the insurers of APG Insolvent Policies as of September 1, 2005; (d) 6% of the amount recovered from issuers of APG Insolvent Policies after September 1, 2005; (e) $5.272 million of the proceeds of APG and APG Services' settlement with Royal Insurance Company of America; and (f) $2.144 million of the proceeds of APG and APG Service's settlement with Fireman's Fund. GIT Plan, GIT Doc. No. 5427, §4.2.3(a).

[54]   GIT Plan, GIT Doc. No. 5427, §3.2.5.1.

[55]   Order Approving (I) the Contents and Service of the Solicitation Package, (II) the Procedures for Voting and Tabulation of Votes, (III) the Forms of Ballots and (IV) the Procedures for Allowing Claims for Voting Purposes, GIT Doc. No. 5448.

overwhelmingly supported the GIT Plan, both in number and value.[56] GIT Class 3-A (General Unsecured Claims) voted in favor of the plan 97.77 percent in number and 99.45 percent in value and GIT Class 4-A (APG Asbestos Trust Claims) voted in favor of the plan 95.52 percent in number and 93.71 percent in value. Claimants holding silica-related personal injury claims against GIT (classified as GIT Class 5-A claimants) also voted. However, subsequent to the filing of the tabulation, certain GIT Class 5-A Votes included in the Master Ballot for Accepting or Rejecting Third Amended Plan of Reorganization were withdrawn.[57] In the corresponding supplemental vote tabulation, GIT Class 5-A claimants voted in favor of the GIT Plan 98.4 percent in number and 97.11 percent in value of claims held.[58]

At the Confirmation Hearing held on June 5-6, 2006, GIT and Objecting Insurers presented argument and evidence relating to the proposed silica trust.[59] GIT presented the testimony of Philip A. Pahigian, the APG Silica Future Claimants Representative,[60] and Jon A. Allegretti, GIT's president. On June 6, 2006, this court continued the confirmation hearing on the Debtors' Plans of Reorganization to permit parties to present additional evidence on GIT's need for a silica trust and a silica channeling injunction.[61]

---

[56] *See* Declaration of Kathleen M. Logan Certifying Voting On and Tabulation of Ballots Accepting and Rejecting the Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. And Its Subsidiaries, GIT Doc. No. 5804.

[57] *See* Motion of Robert G. Taylor II., P.C. to Withdraw Certain GIT Class 5-A Votes Included in the Master Ballot for Accepting or Rejecting Third Amended Plan of Reorganization, Doc. No. 6531; Order Authorizing Withdrawal of Certain GIT Class 5-A Votes Included in Master Ballot for Accepting or Rejecting Third Amended Plan of Reorganization, GIT Doc. No. 6784.

[58] *See* Oct. 18, 2006, Supplemental Declaration Of Kathleen M. Logan, GIT Doc. No. 6750.

[59] *See* June 5-6, 2006, Confirmation Hearing Transcript, GIT Doc. No. 6210.

[60] *See* Orders Approving the Retention of Mr. Philip A. Pahigian as Legal Representative for Future Silica Personal Injury Claims, GIT Doc. Nos. 2102 and 3560.

[61] *See* June 29, 2006, Omnibus Hearing Transcripts, GIT Doc. No. 6320, at 37; June 5-6, 2006, Confirmation Hearing Transcript, GIT Doc. No. 6210.

In preparation for the continued confirmation hearing, GIT (1) obtained supplemental submissions regarding silica exposures and medical evidence from approximately 4,636 of the claimants who are currently asserting silica claims against APG; (2) retained Dr. Timothy Wyant, a biostatistician and expert in future claims forecasting, to project future silica claims filing rates; and (3) engaged Kevin Nystrom of Kroll Zolfo Cooper, LLC, GIT's financial advisor, to examine the financial impact on GIT if GIT were forced to resolve the present and future claims in the tort system without the APG Silica Trust. The Objecting Insurers retained Dr. Denise Neumann Martin, of National Economic Research Associates, Inc. ("NERA"), to review the report submitted by Dr. Wyant and hired Daniel F. Dooley of Morris-Anderson & Associates, an operational and financial advisory consulting firm, to assess the financial ability of GIT to resolve its silica related liability and costs without the APG Silica Trust.

The corresponding expert reports[62] and supplemental reports[63] were filed in September and October of 2006 and the experts were deposed. On October 26-27, 2006, the court heard additional testimony and admitted additional evidence into the record. At the conclusion of the hearing, this court closed the evidentiary record and agreed to review post-trial briefs from GIT and Objecting Insurers in support of their positions.[64]

---

[62]  Sept. 15, 2006, Expert Report of Timothy Wyant, Ph.D.: Estimate of the Number and Impact of Present and Future Silicosis Claims Against A.P. Green, Inc., GIT Doc. No. 6635; April 25, 2006, Expert Report of Kevin Nystrom, GIT Doc. No. 5840; Sept. 29, 2006, Rebuttal Report of Dr. Denise Martin, Ph.D., GIT Doc. No. 6720; Expert Report of Daniel F. Dooley, GIT Doc. No. 6719.

[63]  Oct. 17, 2006, Supplemental Expert Report of Timothy Wyant, Ph.D. on the Number and Impact of Present and Future Silicosis Claims Against A.P. Green, Inc., GIT Doc. No. 6740; Oct. 17, 2006, Revised Supplemental Report of Kevin Nystrom, GIT Doc. No. 6741 (revised Sept. 15, 2006, Supplemental Nystrom Report, GIT Doc. No. 6636); October 19, 2006, Declaration of Daniel F. Dooley, GIT Doc. No. 6761.

[64]  Oct. 27, 2006, Confirmation Hearing Transcript, GIT Doc. No. 6861, at 12. See Hartford's Post-Hearing Submission in Opposition to the Confirmation of the Debtors' Third Amended Plan of Reorganization Dated December 28, 2005, GIT Doc. No. 6869; Debtors' Post-Hearing Brief in Support of Confirmation of the Third Amended Plan of Reorganization of Global Industrial Technologies, Inc. And Its Subsidiaries, GIT Doc. No.

Continued on following page

At the November 17, 2006, hearing, this court raised concerns regarding the separate and unequal treatment of claims for silica-related personal injuries allegedly caused by first exposure to silica or silica containing products or materials that occurred on or after July 1, 2000, and on or before the February 14, 2002, Petition Date (the "Post-July 2000 Silica Claims").[65] The Silica Trust to be created pursuant to the Third Amended Plan, prior to Amendment on December 15, 2006, included only claims in which first exposure occurred prior to July 1, 2000 (the "Pre-July 2000 Silica Claims"). The July 1, 2000, cutoff date was chosen because it was the date upon which GIT initiated a labeling and notice program for its silica-containing products. In response to the court's concerns, the December 15, 2006, Amendment (as modified on January 30, 2007) placed all silica claims arising from prepetition exposure to silica or silica-containing products or materials into GIT Class 5-A so that they are channeled into the APG Silica Trust and treated in accordance with the APG Silica TDP.[66] To accommodate the additional claims, GIT agreed to contribute $500,000 to the APG Silica Trust, 10 years after the plan is confirmed.[67] Also, an additional $4 million from APG's settlement with certain Travelers insurance companies was

---

Continued from previous page

6870; Travelers Post-Hearing Brief in Further Support of Their Objections to the Third Amended Plan on the Grounds that the APG Silica Trust is Neither Necessary Nor Appropriate Under Section 105 of the Bankruptcy Code, GIT Doc. No. 6875; Post-Trial Submission of Certain AIG Member Companies Including National Union Fire Insurance Company of Pittsburgh, Pa. in Opposition to the Confirmation of the Debtors' Third Amended Plan of Reorganization Dated December 28, 2005 and Joinder in Submissions of Other Insurers, GIT Doc. No. 6873; Certain Insurers' Joinder to Post-Trial Submissions in Connection with Resumed Confirmation Hearing Scheduled for October 26, 2006, GIT Doc. No. 6880. Although all of Travelers objections have been resolved pursuant to a settlement agreement, the court continues to reference certain submissions from Travelers, such as GIT Doc. No. 6875 above, for completeness of the record. *See* Order Approving Settlement Agreement with Travelers and Authorizing the Sale of Interests in Certain Insurance Policies, GIT Doc. No. 7065.

[65] Nov. 17, 2006, Hearing Transcript, GIT Doc. No. 6908. Concerns were reiterated at the December 20, 2006, and January 17, 2007, hearings. *See* Transcripts at GIT Doc. Nos. 6994 and 7071, respectively.

[66] GIT Doc. No. 7091, Exh. A.

[67] *Id.* at 4, §4.2.3(b)(ii).

added to $31.5 million in insurance settlements already funding the trust, bringing the total of insurance proceeds used to fund the trust to approximately $35.5 million.[68]

Pursuant to the Supplemental Solicitation Order,[69] GIT circulated the Supplemental Solicitation Package to all members of GIT Class 5-A. GIT Class 5-A voted 98.94 percent in number and 97.15 percent in amount to accept the GIT Plan, as amended by the December 15, 2006, Amendment.[70]

GIT received only two objections to the Amendment: one from National Union Fire Insurance Company of Pittsburgh, Pa. and any other entities related to American International Group, Inc. (collectively, the "AIG Member Companies") that engaged in insurance transactions with the Debtors,[71] and the other from Hartford Accident and Indemnity Company, First State Insurance Company, and Twin City Fire Insurance Company (collectively, "Hartford").[72] Both objections were joined by California Union.[73] The continued confirmation hearing addressing these objections was held on March 16, 2007.

[68]   *Id.* at 2,3, §4.2.3(a). *See also* note 53, *supra*, and Order Approving Settlement Agreement with Travelers and Authorizing the Sale of Interests in Certain Insurance Policies, GIT Doc. No. 7065.

[69]   Order Approving (A) the Adequacy of Supplement to Disclosure Statement; (B) The Contents and Service of the Supplemental Solicitation Package; and (C) the Procedures for Voting. GIT Doc. No. 7073.

[70]   Declaration of Kathleen M. Logan Certifying Voting On, and Tabulation of GIT Class 5-A Ballots Accepting and Rejecting, Third Amended Plan of Reorganization Dated December 28, 2005, as Amended by December 15, 2006, Amendment, of Global Industrial Technologies, Inc. and Its Subsidiaries, GIT Doc. No. 7183, ¶ 12.

[71]   Objection of National Union Fire Insurance Company of Pittsburgh, Pa. and Related Companies to the Third Amended Plan of Reorganization of Global Industrial Technologies, Inc., *et al.*, Dated December 28, 2005, as Supplemented by the December 15, 2006, Amendment to Plan, GIT Doc. No. 7185.

[72]   Hartford's Supplemental Objection to Proposed Plans of Reorganization of GIT and NARCO, GIT Doc. No. 7186. The Court has determined that Hartford lacks standing to raise these objections. *See* GIT Doc. No. 7703.

[73]   Certain Insurers' Joinder to Supplemental Confirmation Objections, GIT Doc. No. 7191. The Court has determined that California Union lacks standing to raise these objections. *See* GIT Doc. No. 7703.

## A.  Analysis

### 1.  APG Silica Trust and Silica Channeling Injunction

In opposition to the confirmation of the GIT Plan, Objecting Insurers argue that the Silica

Trust and Silica Channeling Injunction are neither necessary nor appropriate under §105 of the

Bankruptcy Code.  They assert that because §524(g) of the Bankruptcy Code, which sets forth

the criteria for establishment of trusts for asbestos-related claims,[74] does not apply to silica

claims, the operative section for establishment of the Silica Channeling Injunction is §105(a).

Section 105(a) states that:

> The court may issue any order, process, or judgment that is
> necessary or appropriate to carry out the provisions of this title.
> No provision of this title providing for the raising of an issue by a
> party in interest shall be construed to preclude the court from, sua
> sponte, taking any action or making any determination necessary
> or appropriate to enforce or implement court orders or rules, or to
> prevent an abuse of power.

Although §105 supplements the court's specifically enumerated bankruptcy powers by

authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code, it

"does not create substantive rights that would otherwise be unavailable under the Bankruptcy

Code." *In re Combustion Engineering, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004).  However,

§105(a) permits a court to issue injunctive relief where "unusual circumstances" exist, such as in

cases involving "settlement of massive liabilities against debtors and co-liable parties." *Gillman*

*v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 213 (3d Cir, 2000).  Numerous

courts have concluded that the establishment of a trust and the entry of a channeling injunction

---

[74]   Section 524(g)(2)(B)(I) requires that the injunction be implemented in connection with a trust that
assumes the liabilities of a debtor arising from "actions seeking recovery for damages allegedly caused by the
presence of, or exposure to, asbestos or asbestos containing products."

under §105(a) and §1123(b)(6) of the Bankruptcy Code[75] are appropriate to resolve non-asbestos-related liabilities under certain circumstances where "the injunction plays an important part in the debtor's reorganization plan." *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 293 (2nd Cir. 1992)(securities class action claims). *See also Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F.3d 648 (6th Cir. 2002)(silicone breast implant claims); *Menard-Sanford v. Mabey (In re A.H. Robins Co.*), 880 F.2d 694 (4th Cir. 1989)(Dalkon Shield birth control device claims); *In re Kaiser Aluminum Corp.*, 343 B.R. 88 (D. Del. 2006)(silica, "coal tar pitch volatiles," and "noise induced hearing loss" tort liabilities).

The U.S. Court of Appeals for the Third Circuit has declined to adopt a specific test for determining the necessity and appropriateness of issuing third-party injunctions of the type we are asked to issue in this case. In *Continental Airlines, supra*, 203 F.3d at 212, the court endorsed a "more flexible approach" that allows for third-party injunctions "in the context of extraordinary cases" such as *A.H. Robins, supra, Drexel Burnham, supra*, and *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.*), 843 F.2d 636 (2d Cir. 1988). While declining to rule prospectively, the *Continental Airlines* court dictated that the following factors are required: "fairness, necessity to the reorganization, and specific factual findings to support these conclusions." *Continental Airlines*, 203 F.3d at 212. All of those factors are satisfied herein.

---

[75] Section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title . . ." and Section 1123(b)(6) provides that, subject to subsection (a), the plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title."

a. **Necessity to the reorganization.**

i. **Number of Current and Future Silica Claims.**

Without the Silica Trust and Silica Channeling Injunction, GIT will need to defend and resolve approximately 4,636[76] known personal injury claims in the tort system immediately after emerging from bankruptcy. Using claims forecasting methods,[77] GIT's expert, Dr. Wyant, predicted that there will be between 10,360 and 23,304 additional silica claims[78] asserted against GIT through the year 2050, with between 4,192 and 9,538 of those claims filed in the next ten years.[79]

In essence, the claims forecasting method Dr. Wyant used to calculate the likely number of future silica claims against GIT[80] was as follows.[81] First, he calculated and assessed a baseline (or current) silica claims rate against GIT.[82] In doing so, Dr. Wyant relied on the supplemental information forms completed by the holders of claims in GIT Class 5-A who voted on confirmation of the GIT Plan and the silica claims filing rates against Harbison-Walker ("H-W") and General Refractories ("GR"), two refractories companies he determined were similar to

---

76   *See* April 14, 2006, Declaration of Kathleen M. Logan, GIT Doc. No. 5804 (reporting that 5,125 silica-related claimants submitted ballots), and Oct. 18, 2006, Supplemental Declaration of Kathleen M. Logan, GIT Doc. No. 6750 (reporting that, as a result of 489 ballots being withdrawn, a total of 4,636 ballots remained).

77   *See* Sept. 15, 2006, Expert Report of Timothy Wyant, Ph.D.: Estimate of the Number and Impact of Present and Future Silicosis Claims Against A.P. Green, Inc., GIT Doc. No. 6635.

78   In his report, Dr. Wyant sometimes refers to silica claims as "silicosis claims" but explains that "[silicosis claims] will involve additional related injuries such as lung cancer or autoimmune diseases." Sept. 15, 2006, Expert Report of Timothy Wyant, Ph.D.: Estimate of the Number and Impact of Present and Future Silicosis Claims Against A.P. Green, Inc., GIT Doc. No. 6635, at 5.

79   October 17, 2006, Supplemental Expert Report of Timothy Wyant on the Number and Impact of Present and Future Silica-Related Claims Against A.P. Green, Inc., GIT Doc. No. 6740.

80   In his reports, Dr. Wyant refers to the silica claims as against "A.P. Green." As explained in section II(B) of this opinion, A.P. Green ("APG") is a wholly owned subsidiary of GIT.

81   Specific findings are included in the Debtors' Proposed Findings of Fact and Conclusions of Law, GIT Doc, No. 6874, ¶¶ 92-127.

82   Because claims are generally filed in bursts rather than steadily over time, calculating an annual baseline rate requires averaging claim filings over an appropriate number of years.

APG.[83]  Dr. Wyant went outside GIT for information and used the claims filing patterns of H-W

and GR because GIT had very little silica litigation prepetition.  Dr. Wyant also made

adjustments to the baseline filing rate for silica claims against APG to account for recent events

in or having an impact on the tort system.[84]  Dr. Wyant calculated two baseline silica claims

rates, one using all 4,636 current claims and the other using only current claims with no

connection to doctors who have been criticized in an opinion in multi-district litigation authored

by District Judge Jack.[85]  Second, Dr. Wyant calculated two "future claims multipliers" (one for

2006 through 2016 and one for 2006 through 2050) using the age profiles of the exposed

population at the time their claims became fixed, the mortality rates for the exposed population,

the rate of disease occurrence and/or propensity to file claims for each future year's surviving

and exposed population, and other epidemiological evidence.[86]  Third, the future claims

multipliers were applied to the current silica claims rates.

---

[83]    APG and H-W were companies of comparable size that manufactured and sold the same types of
products for competitive applications, and sold these products to the same customers.  In fact, 268,000 workers filed
claims against both APG and H-W.  Annual sales volumes for APG and H-W were similar (2003: $53 and $63
million respectively, 2004: $58 and $61 million respectively, 2005: $67 and $ 68 million respectively).  APG and H-
W even received a similar number of asbestos claims from and after 1995 of 357, 000 and 315,000 respectively.
While APG had very little silica litigation history prepetition, H-W had 13,500 prepetition claims.  GR made
products like those made by both APG and H-W, and sold them to the same types of buyers.  At one point in time,
all three were competitors, and it would not have been unusual to find products from all three companies in place
simultaneously at the same work site.  According to a report by defense counsel for GR, some 10,000 claims
involving silica exposure had been filed against GR as of June 6, 2003.  Another more recent report on claims
against GR states that in the period 2004-2005, the company received 2,219 claims.  *See* Sept. 15, 2006, Expert
Report of Timothy Wyant, Ph.D.: Estimate of the Number and Impact of Present and Future Silicosis Claims
Against A.P. Green, Inc., GIT Doc. No. 6635.

[84]    *See* note 85, *infra.*

[85]    *In re Silica Products Liability Litigation*, 398 F. Supp. 2d 563 (S. D. Tex. 2005) (Judge Janis Graham
Jack's opinion scrutinized and criticized certain of the silica plaintiffs' doctors, lawyers, and screening companies
for manufacturing diagnoses).

[86]    *See* Sept. 15, 2006, Expert Report of Timothy Wyant, Ph.D.: Estimate of the Number and Impact of
Present and Future Silicosis Claims Against A.P. Green, Inc., GIT Doc, No. 6635.

Application of the claims multipliers to the baseline claims rate based on the full pool of current silica claims in GIT Class 5-A resulted in a "high end" future claims projection of 9,538 additional claims through 2016 and 23,304 claims though 2050. Application of the claims multipliers to the baseline claims rate based on the exclusion of all claims in GIT Class 5-A associated with doctors criticized by Judge Jack resulted in a "low end" future claims projection of 4,192 additional claims through 2016 and 10,360 through 2050. Dr. Wyant explained that, given the uncertainties created by the shortage of prepetition litigation history against GIT and the recent changes in the silica tort environment, the most reasonable conclusion about the likely number of future silica claims against GIT is that the actual claims filing number is likely to fall somewhere in the range delineated by the two projections.

To undermine the future claims projections of Dr. Wyant, the Objecting Insurers relied upon Dr. Denise Neumann Martin. Dr. Martin's analysis was limited to criticism of the work of GIT's expert, Dr. Wyant. She made no estimates of her own. In her report, Dr. Martin opined that Dr. Wyant's conclusions were speculative and unreliable. Dr. Martin's chief complaints about Dr. Wyant were that his forecasting methodology relied on flawed assumptions and failed to incorporate epidemiology. She opined that the vast majority of the current claims against APG cannot serve as a basis for a reliable forecast.[87] However, as noted, Dr. Martin did not independently estimate the number of current or future silica-related claims against GIT. Nowhere in her report or testimony did Dr. Martin express an opinion as to the number of valid current claims and she made no estimate of future silica claims likely to accrue against APG. Rather, the extent of Dr. Martin's criticism of the GIT Class 5-A claims was to cast suspicion over the compensability of certain blocks of claims.

---

[87]  *See* Martin Report, GIT Doc. No. 6720.

Despite the allegations of Dr. Martin, we find that Dr. Wyant, through his reports and testimony, which we credit and accept, has demonstrated the reliability and scientific foundations of his forecasting methodology. In his two reports, Dr. Wyant sufficiently documented the statistical models, epidemiological studies, claim projection models, and other silicosis and claims estimation research that support his forecasting methodology. His statistical charts (Figures 1 and 4 of the Wyant Report) were calculated using a standard statistical method called "loess regression," which is widely used and accepted in scientific and academic fields.[88]

Dr. Martin questioned Dr. Wyant's reliance, regarding his analysis of the number of new diagnoses of silicosis in the United States, on a 2003 article by Dr. Kenneth D. Rosenman, M.D., in the Journal of Industrial Medicine.[89] The study has been accepted in other contexts involving silica matters. OSHA relied upon the Rosenman Study in a 2004 presentation on silicosis.[90] The outside experts commissioned by OSHA to conduct studies regarding the costs and benefits of adopting more stringent silica exposure standards also relied upon the Rosenman Study.[91] We

---

[88] October 17, 2006, Supplemental Expert Report of Timothy Wyant on the Number and Impact of Present and Future Silica-Related Claims Against A.P. Green, Inc., GIT Doc. No. 6740, at 5. Dr. Wyant used loess regression in air pollution studies commissioned by the Health Effects Institute and in analyses used and accepted in the recent federal Civil RICO cases against the cigarette manufacturers. *See* Health Effects Update, Fall 2004, Health Effects Institute, Boston, MA; *United States of America v. Philip Morris USA Inc. et al.*, United States District Court for the District of Columbia, Civil No. 99-CV-02496 (GK), May 2005.

[89] *See* September 15, 2006, Wyant Report, GIT Doc. No. 6635, at 12, *citing* American Journal of Industrial Medicine 44:141-147 (2003), "Estimating the Total Number of Newly-Recognized Silicosis Cases in the United States," Kenneth D. Rosenman, M.D., Mary Jo Reily, MS, and Paul K. Henneberger, MPH, ScD.

[90] *See* September 15, 2006, Wyant Report, GIT Doc. No. 6635, at 10, *citing* "OSHA activities on silica, noise, and hexavalent chromium", Loretta D. Schuman, Ph.D., Silica Project Officer, Office of Chemical Hazards (Non-metals), OSHA, 2004.

[91] *See* September 15, 2006, Wyant Report, GIT Doc. No. 6635, at 10-11, *citing* Eastern Research Group, Inc., Cost and Economic Impact Analysis of the Draft Crystalline Silica Standard for General Industry and Cost and Economic Impact Analysis of the Draft Crystalline Silica Standard for Construction, prepared for Occupational Safety and Health Administration, 2003. The Rosenman Study is referenced on pages 3-55 of the general industry report and pages 4-69 of the construction report.

find Dr. Wyant's use of the Rosenman Study to be appropriate under the circumstances of this case.

As further confirmation of the reliability of his methodology, Dr. Wyant illustrated that his methodology yielded future claims multipliers similar to those in the claim projections conducted by Dr. Frederick C. Dunbar in *Swan Transportation*,[92] Dr. Francine Rabinovitz in *Mid-Valley*,[93] and in the computer model used by Dr. Vasquez,[94] for populations similar to the APG claims[95] and that he took into account all the epidemiology incorporated by Dr. Dunbar and Dr. Vasquez. Both the approach of Dr. Vasquez and Dr. Dunbar follow the basic steps suggested by Dr. Martin as a way to incorporate epidemiology into a claims projection.[96] In fact, Dr. Martin participated in the Dunbar Study.[97] While Dr. Martin criticized individual judgments and/or decisions made by Dr. Wyant in his future claims projection, such as his reliance on the silica litigation history of H-W,[98] her preferred methodology for forecasting claims, as described

---

[92]    The Dunbar multiplier is calculated from figures in his expert report, "Forecast of Personal Injury Claims Alleging Exposure to Silica and Asbestos at Tyler Pipe Industries: 2002 to 2050," Frederick C. Dunbar, Ph.D., October 25, 2002, from *In re Swan Transportation Company*, Case No. 01-11690 (Bankr. D. Del).

[93]    *See* September 15, 2006, Wyant Report, GIT Doc. No. 6635, at 28, n. 29, *citing* "Estimated Number and Value of Future Silica Personal Injury Claims against DII Industries, LLC, and Its Affiliates", Francine Rabinovitz, Ph.D., February 25, 2004. *In re Mid-Valley, Inc.*, Bankr. No. 03-35592 (Bankr. W. D. Pa.), was the case in which the silica claims of DII Industries LLC ("DII") and its affiliates were resolved. See note 108, *infra*.

[94]    The Vasquez multiplier comes from a computer model provided to Dr. Wyant by Dr. Vasquez. Dr. Vasquez has testified frequently in asbestos-related proceedings and supervised the construction on the KPMG-Nicholson curves that are now used by many asbestos experts. Vasquez has used his computer model to prepare silicosis projections for one or more clients. September 15, 2006, Wyant Report, GIT Doc. No. 6635, at 30 and 44.

[95]    September 15, 2006, Expert Report of Timothy Wyant, Ph.D.: Estimate of the Number and Impact of Present and Future Silicosis Claims Against A.P. Green, Inc., GIT Doc. No. 6635, at 30-34.

[96]    Deposition of Denise Martin dated October 10, 2006, October 26, 2006, Confirmation Hearing Binder, Tab 12, at 127:9-128:3.

[97]    *Id.* at 169:25-170:3.

[98]    Dr. Martin alleged that the comparison between APG and H-W is inappropriate. However, Dr. Wyant appropriately explained and illustrated the similarities between the two corporations. *See* note 83, *supra*; September 15, 2006, Expert Report of Timothy Wyant, Ph.D.: Estimate of the Number and Impact of Present and Future Silicosis Claims Against A.P. Green, Inc., GIT Doc. No. 6635, at 21-29; September 29, 2006, Rebuttal Report of Dr.

Continued on following page

in her deposition, was nearly identical to Dr. Wyant's methodology.[99] Dr. Wyant's methodology was also substantially similar to that used by Dr. Rabinovitz in projecting the likely number of silicosis claims against Harbison Walker and DII.[100] We find Dr. Wyant's approach to be reliable and to fit the facts of this case.

Dr. Martin criticizes Dr. Wyant's inclusion in his forecast of some of the known claims that submitted votes on the Plan. Dr. Martin argues that Dr. Wyant should have ignored all current claims in which Dr. Jay Segarra or Dr. Dominic Gaziano provided a diagnosis and all silica claims made by claimants who have ever filed an asbestos claim against any entity. This process would significantly reduce the current claims pool. Debtor contends that "validity" of current claims is not the correct focus. Dr. Martin's position is essentially this: Dr. Martin identified Dr. Segarra and Dr. Gaziano as "discredited" because they were both criticized in a 1998 Manville Trust audit memo as "high volume" doctors[101] and Dr. Segarra was identified in a report by Dr. Joseph Gitlin of Johns Hopkins as a doctor who supported unfounded claims.[102] However, Dr. Martin conceded that claims submitted with supporting documentation are still accepted by, and neither doctor has been banned from submitting documentation in support of

---

Continued from previous page

Denise Martin, Ph.D., GIT Doc. No. 6720, at 3 and 15-16; October 17, 2006, Supplemental Expert Report of Timothy Wyant on the Number and Impact of Present and Future Silica-Related Claims Against A.P. Green, Inc., GIT Doc. No. 6740, at 15-16.

[99] Deposition of Denise Martin dated October 10, 2006, October 26, 2006, Confirmation Hearing Binder, Tab 12, at 127:9-129:4.

[100] See September 15, 2006, Wyant Report, GIT Doc. No. 6635, at 28, n. 29, citing "Estimated Number and Value of Future Silica Personal Injury Claims against DII Industries, LLC, and Its Affiliates", Francine Rabinovitz, Ph.D., February 25, 2004. In re Mid-Valley, Inc., Bankr. No. 03-35592 (Bankr. W. D. Pa.) was the case in which the silica claims of DII Industries LLC ("DII") and its affiliates were resolved. See note 84, supra.

[101] September 29, 2006, Rebuttal Report of Dr. Denise Martin, Ph.D., GIT Doc. No. 6720, at 6.

[102] Letter from Joseph N. Gitlin to David M. Setter, Re: Report on Asbestosis Group AB Tables dated 4/21/04, dated June 1, 2004. Id., at 10.

claims submitted to, the Manville Trust.[103]  Additionally, neither doctor is among the doctors

whose practices were criticized by Judge Jack[104] and who have been subject to various state

and/or federal fraud investigations.[105]  Moreover, even though she was critical of Dr. Wyant's

failure to discount claims based on diagnoses by Drs. Segarra and Gaziano, Dr. Martin admitted

during her testimony that her own firm, NERA, did not discount claims based on diagnoses

submitted by those doctors in NERA's estimation of current and future silica claims in the Swan

Transportation Company Chapter 11 bankruptcy proceedings in the U.S. Bankruptcy Court for

the District of Delaware, Case No. 01-11690.[106]

There is no basis for excluding the claims based on diagnoses by Dr. Segarra or Dr.

Gaziano at this stage in the proceedings.  There has been no bar date set for silica claims and so

the effect of counting ballots submitted by silica claimants is to (a) measure current claims for

which GIT will be out of pocket to address now and (b) to provide a benchmark for the

determination of demands GIT will face in the future.  This is a proceeding to determine whether

GIT meets the standards for relief, including establishing that an injunction addressing its silica

liabilities is necessary to its efforts to reorganize.  Whether or not these claims prove to be

compensable, Debtor must address them, either in the tort system with its inherent risks and the

possibility that any one judgment could be materially adverse and constitute a default under its

financing covenants, or through a trust, an entity with specific terms, funding for which will be

---

[103] Deposition of Denise Martin dated October 10, 2006, October 26, 2006, Confirmation Hearing Binder, Tab 12, at 173:11-174:3.

[104] *In re Silica Products Liability Litigation*, 398 F. Supp. 2d 563 (S. D. Tex. 2005).

[105] *See* October 26, 2006, Confirmation Hearing Transcript, GIT Doc. No. 7683, at 238.

[106] *See* October 26, 2006, Confirmation Hearing Transcript, GIT Doc. No. 7683, at 232. Judge Jack's opinion was entered subsequent to Dr. Martin's claim estimation for Swan Transportation.  However, the studies relied upon in Judge Jack's opinion which identified Dr. Segarra and Dr. Gaziano as high volume were available.

established though this Plan and related documents. Whether, as presently identified, a claim is supported by evidence that may be discredited does not mean that, at the time the claimant is required to prove the claim as opposed to merely file it, additional supporting evidence, perhaps from different doctors, will not be available to the claimant. The Trust and its trustees through Trust Distribution Procedure will address the adequacy of documentation to support any silica claim submitted.

As for the silica claimants who previously filed asbestos claims against other entities, Dr Martin failed to consider that some or all of these dual claims may be legitimate and there is nothing established on this record to indicate that they should be excluded at this stage. Even if none of them eventually prove to be compensable silica claims, Dr. Martin assumes, with no facts to support the assumption, that there will be no defense costs associated with any of them. The court must question how the claims will be made to disappear without some action challenging the claims, which action, of necessity, involves some cost. (As explained in note 108, *infra*, no challenge was raised to the estimate of 30 percent for defense costs.)

This court finds that, based on the evidence and information available, Dr. Wyant's claims forecasting methodology and resulting projection ranges adequately accommodate for the recent developments in the silica tort environment and the uncertainties inherent in all claims forecasting.

### ii.     Economic Burden of Silica Claims

Once Dr. Wyant's claims estimation was complete, GIT retained an expert to calculate the amount of money it would need to resolve the silica claims. Using a comparatively low

resolution value of $4,700 per claim[107] plus a reasonable defense cost factor,[108] Mr. Nystrom,

GIT's financial advisor, calculated that the cost to resolve the current and projected future silica-

related claims would reach almost $28 million for the first three years after exiting bankruptcy,

and $117 million through 2050.[109] In estimating these costs, Mr. Nystrom assumed that half of

the claims in GIT Class 5-A would be resolved in the first two years following confirmation of

the GIT Plan based upon an annual claims rate somewhat below the midpoint of the annual range

predicted by Dr. Wyant.

To determine the financial capacity of GIT to pay for defense and indemnity costs in the

first three years after GIT's emergence from bankruptcy, Mr. Nystrom evaluated the following

available sources of funding: free cash flow, exit financing, and insurance settlements. GIT's

Projected Consolidated Statement of Cash Flow indicates that the Reorganized Debtor will not

have free cash flow until 2008. At the end of 2008, GIT, as reorganized, expects to generate

$3.9 million in free cash. Mr. Nystrom concluded that this sum is unlikely to grow in the several

years following bankruptcy because of the need to invest in capital expenditures, advances in

---

[107] Prior to filing bankruptcy, Harbison-Walker Refractories Company, which manufactures refractory products sold in the same markets as APG, resolved 280 silica-related personal injury claims in the tort system for an average of approximately $4,700 per claim. Of these, 168 were paid, on average, approximately $7,800, while 112 were settled for no payment or were dismissed. The average value of the Travelers settlements of prepetition claims against GIT was $10,833 per claim. In In re Mid-Valley, Inc., Bankr. No. 03-35592 (Bankr. W. D. Pa.), the average settlement value was $6,485 per silica claim. October 17, 2006, Revised Supplemental Report of Kevin Nystrom, GIT Doc. No. 6741, at 5-7. Mid-Valley was the case in which the silica claims of DII Industries LLC ("DII") and its affiliates were resolved. Mid-Valley, Inc. is an indirect subsidiary of DII and was jointly administered with DII, Kellogg Brown & Root, Inc., and other related companies. See In re Mid-Valley, Inc., 2004 Bankr. LEXIS 1552 (Bankr. W.D. Pa. 2004), opinion replaced by, 2004 Bankr. LEXIS 1553 (Bankr. W.D. Pa. 2004).

[108] The October 17, 2006, Nystrom report assumes that the annual cost of defending lung-related mass tort claims is 30 percent of indemnity costs, based on statements made in the Wyant Report that defense costs in these types of cases are typically in the range of 25 percent to 30 percent of indemnity costs. This assumption regarding percentage of indemnity costs was uncontested by the parties. In fact, the Objecting Insurers' expert, Mr. Dooley, also assumed that defense costs constitute 30 percent of indemnity costs. Expert Report of Daniel F. Dooley, GIT Doc. No. 6719, at ¶19.

[109] October 17, 2006, Revised Supplemental Report of Kevin Nystrom, GIT Doc. No. 6741, at 5-9.

technology, and a competitive workforce. GIT's exit financing commitment from JP Morgan Chase does not contemplate its use to pay silica-related personal injury tort claims.[110] The term sheet attached to the commitment letter states that the loan documentation will contain a provision indicating that a material adverse judgment against GIT, as reorganized, would constitute an event of default under the facility, enabling the lenders to call a default thereunder and terminate the facility.[111] A judgment against GIT of any sizable amount would be an event of default.[112] There is also no certainty, despite Objecting Insurers' contentions to the contrary, that the $35.5 million in insurance proceeds to be contributed to the Silica Trust through this Plan would be available to GIT in the absence of the formation of the Silica Trust. The allocation of insurance settlement proceeds to the Silica Trust was the product of a negotiated settlement between representatives of asbestos claimants and representatives of silica claimants for the purposes of confirmation of this plan. Thus, there is no evidence to suggest, let alone to prove to any degree of certainty, that the proceeds would be available to fund GIT's defense and payment of silica claims in the tort system if the Silica Trust is not established.[113] There is no basis for concluding that these funds will be available without establishing a Silica Trust.

---

[110] Commitment Letters dated October 18, 2005, and October 25, 2005, for $75 million Senior Secured Revolving Credit Facility with PNC Bank, N.A., J.P. Morgan Securities, Inc. and J.P. Morgan Chase Bank, N.A., Debtors' Confirmation Hearing Exhibit No. 52. *See also* October 17, 2006, Nystrom Report, ¶¶ 32-34. *See also* Order Authorizing Debtors' to (A) Enter Into Exit Facility Commitment Extension Agreements Outside of the Ordinary Course; and (B) Pay Extension Fees and Grant Administrative Expense Status, GIT Doc. No. 7339.

[111] *Id.*

[112] *See* note 123-124, *supra*, and accompanying text.

[113] *See* October 17, 2006, Revised Supplemental Expert Report of Kevin Nystrom, GIT Doc. No. 6741, at ¶ 39.

Based on all of the above, Mr. Nystrom ultimately determined that, without the Silica Trust and Silica Channeling Injunction, GIT will not have sufficient assets to defend and resolve all of the silica-related claims in the tort system. We agree.

To support their assertion that the APG Silica Trust and Silica Channeling Injunction are unnecessary for successful reorganization of GIT, the Objecting Insurers relied upon Mr. Daniel F. Dooley. Mr. Dooley estimated GIT's financial ability to absorb the economic impact of funding its silica liability and costs in the tort system without the Silica Channeling Injunction and Silica Trust. Mr. Dooley made two estimations of the financial burden: a "Worst Case" estimation and a "Most Likely Case" estimation. Mr. Dooley's "Worst Case" estimation was based on the "low end" of Dr. Wyant's future claims projection which was calculated using a reduced pool of 2,234 current claims.[114] In doing so, and despite the fact that 4,636 claimants have submitted votes on this Plan, Mr. Dooley concluded that Dr. Wyant's "low end" projection is the maximum number of future claims possible. Mr. Dooley's "Most Likely Case" estimation was based upon an additional reduction of the number of current claims to 376, which he calculated based Dr. Martin's report. Mr. Dooley never made an estimation using all 4,636 current claims.

As noted, Dr. Wyant's "low end" future claims projection was reduced based on the reduction of current claims to 2,234.[115] There is simply no evidence to assume that none of these claims originated from a genuine case of silicosis and that none will ever prove to be a valid silica claim. Even reducing current claims to 2234 ignores the fact that some of the claims have

---

[114] This number excludes all claims from GIT Class 5-A with any support by doctors criticized in Judge Jack's opinion. *See* discussion *supra*.

[115] Dooley, Report, GIT Doc. No. 6719, at 4, 5, ¶ 19.

support in the form of x-rays and diagnoses from doctors other than those identified by Judge Jack and presumes that none of the claimants who have diagnoses solely from doctors identified in Judge Jack's opinion will ever consult new doctors to verify their claims as required by the Trust Distribution Procedure.[116] As explained by Dr. Wyant, neither his low end nor high end future claims projections were intended to be relied upon individually. Rather, they establish the upper and lower ends of the likely filing range.

As stated above, Dr. Martin did not estimate the number of present and future silica-related claims. Rather, she called into question the reliability of certain blocks of current claims, such as those criticized by Judge Jack and those for which Dr. Segarra or Dr. Gaziano provided a diagnosis. For his "Most Likely Case" calculation of the financial burden of silica claims, Mr. Dooley excluded every claim called into question by Dr. Martin.[117] This action reduced the number of current claims from 4,636 to 376. This wholesale reduction of current claims eliminated nearly every current claim, a substantial number for which, at a minimum, GIT will incur defense costs, if not suffer some liability outright. Mr. Dooley's manipulation of the number of current claims compels the conclusion that only 8 percent of the current claims have economic value. This conclusion excludes consideration of "nuisance value" encompassed by defense costs. Such a conclusion is unrealistic and is not supported by the evidence. In order to participate in the March 2006 vote on the plan, a personal injury silica claimant was required to submit written certification under penalty of perjury of exposure to a "silica-containing product so that such claimant holds a PI Trust Claim, as defined in the Plan and the related Trust

---

[116] *Id.* at 3, 4.

[117] Expert Report of Daniel F. Dooley, GIT Doc. No. 6719, at ¶19; October 19, 2006, Declaration of Daniel F. Dooley, GIT Doc. No. 6761, at 1118.

Distribution Procedure" and submit additional medical evidence and documentation.[118] The majority of claimants who returned this additional information provided substantive information such as work histories, dates and places of exposure, and medical records.[119] The Trust Distribution Procedure also lays out extensive exposure and diagnostic criteria that include physical examinations, x-ray standards, and respiratory impairment levels.[120]

As is the case in mass tort claims resolution processes, some claims are compensated and some are not, but there are typically defense and administrative costs for both groups. Some of the claims questioned by Dr. Martin and excluded by Mr. Dooley may not ultimately receive compensation. However, GIT must of necessity incur some cost in order to reach such a result. That some claims may not be compensated is accounted for in the estimation of Mr. Nystrom, GIT's expert. The claim resolution value of $4,700 applied by Mr. Nystrom was an average of the settlements in H-W, a company that manufactured refractory products sold in the same markets as APG prepetition. This average included 168 paid claims and 112 claims settled for no payment or dismissed.[121] In choosing that value, Mr. Nystrom by-passed the substantially larger average settlement payments to GIT claimants by Travelers and those in the Mid-Valley bankruptcy.[122] Even assuming that Mr. Dooley's "Most Likely Case" projection proves to be accurate, Mr. Dooley's report established that GIT would be able to handle the economic burden

---

[118] First Amended Voting Procedures: Ballot Solicitation and Tabulation Procedures (GIT Doc. No. 5428, Notice of Amended Voting Procedures and Ballots, Exhibit B).

[119] Wyant Supplemental Report, GIT Doc. No. 6740, at 13-14.

[120] GIT Plan, GIT Doc. No. 5427, §3.2.5.1.

[121] Nystrom Supplemental Report, GIT Doc. No. 6741, at 5-1. *See also* notes 107-108, and accompanying text, *supra*.

[122] The average value of the Travelers settlements of prepetition claims against GIT was $10,833 per claim and the average settlement value in Mid-Valley was $6,485 per silica claim. *See* notes 107-108 and accompanying text, *supra*.

of the silica claims in the tort system only if the insurance proceeds allocation agreements would still be applicable without the Silica Trust and the exit financing would not be impacted. The evidence does not support such a finding.

Mr. Dooley concluded that over the first three years, $17.7 million in insurance settlements would be available and the projected cost of settlement, defense, and administration of the silica claims would be $18 million, leaving $300,000 to be covered by free cash flow. As stated above, the settlement agreements and exit financing are either contingent on formation of a Silica Trust or do not consider the impact of the absence of a Silica Trust. Mr. Dooley conceded that he had not examined the issue of whether the settlement proceeds would be available to pay silica-related claims absent the Silica Trust and it was "just an assumption" that the proceeds would be available for that purpose.[123] We find to the contrary. The proceeds are devoted to the Silica Trust through this Plan because the parties agreed to use the proceeds in this fashion to settle issues between them of how and when insurance proceeds could be accessed by claimants with different diseases and different latency periods. There is no other basis upon which the proceeds can be so designated on this record.

Without the existence of the Silica Trust and Silica Channeling Injunction, one large judgment in the tort system against GIT could cause a default in GIT's financial covenants. The Wyant Report included several examples of cases where juries had found silica defendants liable for substantial judgments,[124] such as the jury award of $1.3 million in *Atvater v. Claycraft Co.*, 2000 Ohio App. LEXIS 5645 (Ohio Ct. App. 2000). Mr. Dooley acknowledged in his testimony that a large judgment against GIT would likely be sufficient to give rise to an event of default

---

[123] *See* October 26, 2006, Confirmation Hearing Transcript, GIT Doc. No. 7683, at 272.

[124] *See* September 15, 2006, Wyant Report, GIT Doc. No. 6635, at 35-36.

under GIT's proposed exit financing facility, resulting in an additional strain on GIT's finances.[125] Thus, the Objecting Insurers' own expert has acknowledged that, without the benefit of a §105(a) injunction imposed to implement silica claims resolution through a trust, there is no certainty, or even a substantial likelihood, that GIT will be able to reorganize without the need for further reorganization. Therefore, without the Silica Trust, the court could not make the finding required by §1129(a)(11).

The court finds that GIT has established by more than preponderate evidence that the §105(a) injunction is necessary to its reorganization.

### b.    Fairness.

The class of silica claimants voted overwhelmingly to approve the plan. As stated above, the members of GIT Class 5-A voted 98.4 percent in number and 97.15 percent in amount to accept the GIT Plan, as amended by the December 15, 2006, Amendment. The court in *In re Dow Corning Corp., supra*, 280 F.3d at 658, found "overwhelming support" where 78.9 percent of claimants in the affected class had voted to approve the plan.[126] By any standard, the votes here demonstrate the support of the creditors for this plan.

The APG Silica Trust Agreement and APG Silica Trust Distribution Procedures contain provisions that allow the APG Silica Trustee to monitor and control disbursements to beneficiaries, to ensure both the long-term viability of the Trust and equality of treatment to both

---

[125] *See* October 26, 2006, Confirmation Hearing Transcript, GIT Doc. No. 7683, at 283.

[126] *See In re Dow Corning Corp.*, 287 B.R. 396, 414 (E.D. Mich. 2002), for voting details.

current and future claimants over the life of the APG Silica Trust.[127] Mr. Pahigian, the Silica Future Claimants Representative, testified that if the Third Amended Plan, as amended, is approved, the APG Silica Trust will have sufficient means to make distributions to claimants so that current claims and future demands will be paid in substantially the same manner.[128] He testified that issuing the Silica Channeling Injunction to GIT and the GIT Protected Parties would be "fair and equitable with respect to people who might subsequently assert APG Silica Demands against any such Protected Party, in light of the benefit provided, or to be provided, to the APG Silica Trust by or on behalf of any such GIT Protected Party."[129] The court credits his testimony and agrees that the fundamental rights of the silica claimants and future silica demand holders are preserved through the APG Silica Trust mechanisms.

We find that the testimony and evidence establish that the APG Silica Trust and Silica Channeling Injunction are fair with respect to the current and future silica-related personal injury claims that are to be handled by the Trust.

Based on the evidentiary record, we find that the APG Silica Trust and Silica Channeling Injunction are appropriate under §105 and §1123(b)(6) and that the Trust is necessary for the successful reorganization of GIT.

### 2. December 15, 2006, Amendment

---

[127] *See* APG Silica Trust Agreement and APG Silica TDP, GIT Doc. No. 5427, §3.2.5.1. *See also* Pahigian Decl., GIT Doc. No. 6061, ¶ 28-32.

[128] *See* Pahigian Decl., GIT Doc. No. 6061, ¶ 27. *See also* June 5, 2006, Confirmation Hearing Transcript, GIT Doc. No. 6208, at 198.

[129] *See* Pahigian Decl., GIT Doc. No. 6061, ¶ 27.

The December 15, 2006, Amendment to the GIT Plan provided for the inclusion of

prepetition Post-July 2000 Silica claims in the APG Silica Trust by expanding GIT Class 5-A to

include:

> all claims and demands for personal injuries allegedly caused by exposure to
> silica or silica containing products or materials of A.P. Green Industries, Inc.,
> f/k/a A.P. Green Refractories Co. ("APG"), its subsidiaries and/or their respective
> predecessors that began on or after July 1, 2000 and before February 14, 2002.
> Accordingly, all claims for personal injury allegedly caused by exposure that
> begin prior [sic] February 14, 2002 to silica or silica-containing products of APG,
> its subsidiaries, and/or their respective predecessors will now constitute APG
> Silica Trust Claims. All APG Silica Trust Claims are impaired under the Plan and
> will be resolved pursuant to the terms set forth in the APG Silica Trust Agreement
> and the APG Silica TDP in accordance with Section 3.2.5.1 of the Plan.[130]

The Post-July 2000 Silica claims, which had passed through the Plan unimpaired prior to the

Amendment, will be claims channeled to the Silica Trust and impaired under the Amendment.[131]

The AIG Member Companies' objection alleged that the GIT Plan cannot be confirmed if

it includes the Amendment because it improperly classifies Post-July 2000 silica claims with

Pre-July 2000 silica claims in violation of §1122(a) of the Bankruptcy Code. Section 1122(a)

states that "a plan may place a claim or an interest in a particular class only if such claim or

interest is substantially similar to the other claims or interests of such class." AIG Member

Companies contend that even though both are prepetition, the Post-July 2000 Silica Claims and

the Pre-July 2000 Silica Claims are not substantially similar because of differences in the

availability of defenses to Debtor. They allege that a labeling and notice program initiated by

GIT on July 1, 2000, has contributed to increased awareness of the effects of silica exposure,

---

[130] Supplement Dated December 12, 2006, to Disclosure Statement to Accompany Third Amended Plan of Reorganization Dated December 28, 2005, of Global Industrial Technologies, Inc. and Its Subsidiaries. GIT Doc. No. 6965, Exh. B, ¶ A.1.

[131] The evidence in this case supports Debtor's contention that the number of silica claims postpetition will be far fewer than those prepetition and that Debtor will be able to deal with those claims in the ordinary course of its business, particularly given the long term latency periods and the availability of better health protective devices and training. *See* June 5, 2006, Hearing Transcript, Doc. No. 6210, at 47-48.

thereby materially decreasing the risk of liability for Post-July 2000 Claims. They cite *Phillips v. A-Best Products Co.*, 665 A.2d 1167 (Pa. 1995), in which the Pennsylvania Supreme Court decided that plaintiff had failed to establish his claim for silica exposure because his employer had given dust masks to its workers and had a training program on the dangers of silica sand. Although AIG Member Companies' argument may prove to provide Debtor with a valid defense, that does not change the nature of the underlying claim of disease due to exposure to a silica product of GIT's manufacture or distribution.

Regardless of what defenses to payment insurers may have in future coverage litigation resulting from the implementation of the notice program, the prepetition Post-July 2000 Silica Claims and the Pre-July 2000 Silica Claims are substantially similar under §1122(a). They all involve manifestations of the same diseases based on exposure to the same products manufactured or supplied by GIT during the prepetition period. They also easily fit within the scope and application of the APG Silica Trust TDP.[132]

The Court of Appeals for the Third Circuit in *In re Jersey City*, 817 F.2d 1055, 1060-61 (3d Cir. 1987), held that "classification of the claims or interests must be reasonable." *See also John Hancock Mutual Life Insurance Co. v. Route 37 Business Park Associations*, 987 F.2d 154 (3d Cir. 1993); *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 586 (6th Cir. 1986)(discussing the legislative history of §1122). The Court of Appeals in *Jersey City* also stated that "it remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case." *In re Jersey City, supra*, 817 F.2d at 1060-61. The

---

[132] GIT Plan, GIT Doc. No. 5427, §3.2.5.1.

court finds that the classification of claims in the Amendment based on prepetition exposure to APG's silica containing products and materials is reasonable.

In fact and in law, with few exceptions articulated by Congress in the Bankruptcy Code, claims arising out of postpetition activities are treated differently from claims arising out of prepetition activities. The petition date is a common line of demarcation for the classification of claims in bankruptcy.[133] Attempting to further classify prepetition claims based on available defenses and the likelihood of their success, as suggested by AIG, is the more problematic classification route because of the speculative nature of the endeavor.[134] It is the nature of the claims being classified that must be substantially similar to the other claims in the class under §1122(a), not the nature or availability of defenses. The Amendment accomplishes a reasonable classification of claims and demands in Class 5-A.

Although we found Hartford to lack standing, we address one issue raised by Hartford in the event that the District Court finds standing to exist. The issue involves treatment of claims within a class. Hartford argues that, based on the decision of the Court of Appeals for the Third Circuit's decision in *In re Frenville Co.*, 744 F.2d 332 (3d Cir. 1984), which stated that for the purposes of bankruptcy law in a relief from stay context, a claim arises at the same time the underlying state law cause of action accrues, the cause of action for the silica claims does not

---

[133] *See, e.g.*, 11 U.S.C. §101(5) (defining "claim").

[134] As illustrated by *Phillips v. A-Best Products Co.*, 665 A.2d 1167 (Pa. 1995), it is possible that even some of the Pre-July 2000 Silica claimants were warned of the dangers of silica sand (the claimant in *Phillips* was trained prior to 1995). In the case at bench, Debtor asserts that it implemented its own labeling and notice program in July 2000. Given the availability of defenses that allege both actual and constructive notice to claimants of the dangers of silica, none of which can be asserted at this stage of the proceedings and none of which will be ripe for assertion until a claims resolution mechanism is in place, the court finds that there is a reasonable basis upon which to classify the prepetition claims together regardless of availability of defenses to a specific claim.

arise until the injury becomes known to the plaintiff.[135] Therefore, Hartford argues, prepetition and postpetition future demand holders are similarly situated because they hold "future demands" rather than "claims" inasmuch as the symptoms of silica-related disease will not be discovered for years, due to the latency period common with such diseases. Hartford asserts that because the GIT Plan treats prepetition and postpetition holders of future demands differently (prepetition claims and demands are directed to the Trust and postpetition demands pass through to be resolved in the tort system) the Plan violates 11 U.S.C. §1123(a)(4) which Hartford asserts requires "equal treatment of similarly situated claims."[136] However, as exhibited by the plain language of the statute, § 1123(a)(4) "only requires equality of treatment of claims or interests placed in the same class." *In re Acequia, Inc.*, 787 F.2d 1352, 1363 (9th Cir. 1986). In this Plan, postpetition demands are not in the same class as prepetition claims and demands.

Additionally, the application of *Frenville* to the present case is misplaced. In *Frenville*, the debtor's prior accounting firm was sued for preparing false financial statements several months after the debtor had filed for bankruptcy. The accounting firm countered with a suit for contribution and indemnification against the debtor. The court decided that, for the purposes of the automatic stay under 11 U.S.C. §362(a)(1), state law determined when a claim arose and, therefore, pursuant to New York law, the claim arose when the suit was filed against the accountants. In a footnote, the court added that its analysis may not be applicable to "a bankruptcy proceeding stemming from a mass tort -- such as exposure to asbestos." *In re*

---

[135] It is likely that some states would apply the "discovery rule" under which the cause of action accrues only after the injury becomes known to the plaintiff See, e.g., *Jones v. Chemetron Corp.*, 212 F.3d 199 at 206 (3d Cir. 2000) ("The Ohio Supreme Court has held that where an injury is latent, the 'discovery rule' dictates that a cause of action based on that injury accrues . . . when the injury is manifest and when the injured party knows or has reason to know the cause of the injury."); *Childs v. Haussecker*, 974 S.W.2d 31, 36-37 (Tex. 1998) (the Supreme Court of Texas held that the discovery rule applies to claims for latent occupational diseases).

[136] GIT Doc. No. 7186, at 5.

*Frenville Co.*, 744 F.2d at 337, n. 8. As noted, *supra*, unusual circumstances may arise when dealing with mass tort liabilities. Also, the latency period common with asbestos-related and silica-related diseases further complicates the bankruptcy process of identifying future claims. Therefore, bankruptcy courts are generally afforded more flexibility and discretion in utilizing a §105 injunction and approving confirmation of plans that address mass tort liabilities not otherwise encompassed within §524(g). *See In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), and *In re Jersey City*, 817 F.2d 1055 (3d Cir. 1987).[137] As the court in *Frenville* recognized, bankruptcy proceedings stemming from mass torts present a different issue based on significantly more complex facts than those addressed in *Frenville*. We therefore find that *Frenville* is inapposite to this case.

First, the issue does not involve a motion for relief from stay under §362. Second, unlike *Frenville*, this case involves mass torts, and GIT's resolution of those potential liabilities is crucial to its successful reorganization. Third, assuming without deciding that state law would govern resolution of the claims, the laws of many states may be applicable to the determination of when the claims accrue, were discoverable, were discovered, etc. Thus, calculation of the accrual dates under a variety of state laws is a matter incapable of resolution at this time, unlike the situation in *Frenville*.

Hartford also argued that if its *Frenville* argument fails, the petition date dividing line results in future and current claims being treated differently in violation of *In re Combustion Engineering*, 391 F.3d 190, 242 (3d Cir. 2004). However, Combustion Engineering is

---

[137] In *In re Combustion Engineering*, 391 F.3d 190 (3d Cir. 2004), the Court of Appeals refused to permit the use of §105 as a substitute for §524(g). The instant issue does not involve asbestos claims to which §524(g) applies nor does it involve the issue addressed in *Combustion Engineering*.

inapplicable because §524(g) authorizes injunctions only in asbestos mass tort cases. We must rely on §105 in addressing silica claims even when those claims satisfy §524(g) standards.

Because of the inclusion of Post-July 2000 Silica claims in the Trust, both Hartford and AIG allege that GIT abandoned the defenses afforded by the labeling and notice program it initiated. That contention, however, is not supported by any evidence on this record. Only prepetition claims and demands that are entitled to payment because they satisfy the criteria will be paid. Postpetition demands will be addressed in the tort system. Both will be subject to defenses. Moreover, this is not an insurance coverage case, as stated repetitiously on the record. This court is not considering or ruling on insurance coverage issues. To the extent that a prepetition claim or demand is settled by the Trust or a postpetition demand is settled by the Reorganized Debtor, and then a claim is presented to the insurers for payment but the insurers contest their obligation to pay, this Plan preserves the insurers' defenses to coverage.

The classification of claims contained in the Amendment is reasonable and the claims in GIT Class 5-A are substantially similar. The objections to classification are overruled. The standards of 11 U.S.C. §1122 are met.

## IV.    Overruling of Certain Objections to Confirmation

All objections not otherwise addressed herein or previously withdrawn are hereby overruled for the reasons set forth herein, on the record at the Confirmation Hearing and in the Findings of Fact and Conclusions of Law set forth below.

## V.   Findings of Fact and Conclusions of Law

Having resolved the remaining objections to confirmation of the Plans, the court sets

forth the following Findings of Fact and Conclusions of Law.  After considering the Plans, the

Amendment, the Disclosure Statement and related documents, the declarations submitted in

support of the Plans, and the testimony of witnesses and exhibits presented at the Confirmation

Hearing, and based on the preponderance of the evidence presented by the Debtors and parties in

interest at the hearing, this court accepts Debtors' Proposed Findings of Fact and Conclusions of

Law[138] subject to the following modifications listed below.[139]

### A.   Modifications by the Court to Debtors' Proposed Findings of Fact and Conclusions of Law

**1. Modifications that Incorporate the Amendments to the APG Silica Trust.**  The

following technical modification amendments are made to Debtors' Proposed Findings of Fact

and Conclusions of Law:

**a. Paragraph 1**.  The reference to the "Third Amended Plans of Reorganization" in

paragraph 1 is hereby deleted and replaced with "Third Amended Plans of

Reorganization dated December 28, 2005, as amended by the Amendment Dated

---

[138]  NARCO Doc. No. 4792; GIT Doc. No. 6874.  Travelers also submitted Proposed Findings of Fact and Conclusions of Law and AIG Member Companies filed joinder.  See Proposed Findings of Fact and Conclusions of Law Regarding the Insufficiency of Evidence to Support a Section 105 Injunction Due to the Lack of Necessity and Appropriateness of the APG Silica Trust, GIT Doc. No. 6876; Post-Trial Submission of Certain AIG Member Companies Including National Union Fire Insurance Company of Pittsburgh, PA in Opposition to the Confirmation of the Debtors' Third Amended Plan of Reorganization Dated December 28, 2005, And Joinder in Submission of Other Insurers, GIT Doc. No. 6873.  However, this court finds that any discrepancies between Debtors' and Travelers' Proposed Findings of Fact and Conclusions of Law have been resolved by the overruling of Objecting Insurers objections to Confirmation of the GIT Plan.

[139]  Debtors' Proposed Findings of Fact and Conclusions of Law were filed on November 13, 2006, before the final Amendment and hearings.

December 15, 2006." The subsequent use of "GIT Plan" throughout the Findings of Fact

and Conclusions of Law hereby refers to the GIT Plan as amended. The " November 17,

2006" and "March 16, 2007" Confirmation Hearing Dates are hereby added to the other

dates listed in Paragraph 1. Paragraph 1 now reads in full as follows:

> 1. By Order of January 30, 2006 (Debtors' Confirm. Hrg. Ex. 8 **[NARCO Doc. No. 3997, GIT Doc. No. 5446]**), after notice to all parties in interest and hearings held on December 12, 2005, and January 17, 2006, this Court approved the Combined Disclosure Statement (the "Disclosure Statement") to Accompany the Third Amended Plans of Reorganization (the "NARCO Plan" and the "GIT Plan," and collectively, the "Plans") Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries ("NARCO") and Global Industrial Technologies, Inc. and Its Subsidiaries ("GIT"). The NARCO Plan was subsequently revised or supplemented by: (i) Modification to the Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries, filed June 21, 2006 **[NARCO Doc. No. 4454]**; (ii) Proposed Directors, Trustees and Trust Advisory Committee Members, filed June 21, 2006 **[NARCO Doc. No. 4455]**; (iii) Notice of Proposed Initial Trustees, filed May 17, 2007 **[NARCO Doc. No. 5145]**; (iv) Supplement to North American Refractories Company, *et al.* Protected Parties, filed October 1, 2007 **[NARCO Doc. No. 5420]**; and (v) October 25, 2007 Technical Plan Amendments to the Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries **[NARCO Doc. No. 5451]**. The GIT Plan was subsequently modified or supplemented by: (i) Modification to the Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries, filed June 21, 2006 **[GIT Doc. No. 6244]**; (ii) Proposed Directors, Trustees and Trust Advisory Committee Members, filed June 21, 2006 **[GIT Doc. No. 6245]**; (iii) Amendment Dated December 15, 2006 to Third Amended Plan of Reorganization Dated December 28, 2005 of Global Industrial Technologies, Inc. and Its Subsidiaries, filed on December 15, 2006 **[GIT Doc. No. 6971]**; (iv) Amendment to Third Amended Plan of Reorganization of Global Industrial Technologies, Inc. and Its Subsidiaries, filed January 30, 2007 **[GIT Doc. No. 7091]**; (v) Supplement to Global Industrial Technologies, Inc., *et al.* Protected Parties, filed October 1, 2007 **[GIT Doc. No. 7765]**; and (vi) October 25, 2007 Technical Plan Amendments to the Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries **[GIT Doc. No. 7819]**. A Confirmation Hearing was held on June 5-7, 2006, October 26-27, 2006, November 17, 2006, and March 16, 2007. After considering the Plans, the Disclosure Statement and related documents, the declarations submitted in support of the Plans, and the testimony of witnesses and exhibits presented at the Confirmation

Hearing, and based on the preponderance of the evidence presented by the Debtors and parties in interest at the hearing, the Court makes the following Findings of Fact and Conclusions of Law. [Footnote 1 "Unless otherwise defined herein, all capitalized terms shall have the meaning assigned thereto in the Plan."]

**b. Paragraph 113**. The reference to the June 30, 2000 cut-off date for sililca-related claims that will be channeled to the Silica Trust is hereby amended, along with the reference to an "additional 18 years." Paragraph 113 now reads in full as follows

113. The H-W claimant population is restricted to claimants exposed to H-W products by 1982. The APG claimant population, however, includes claimants exposed to APG products through February 14, 2002, an additional 20 years. Dr. Wyant concluded that as a result of the later exposure requirements, APG would be expected to have a higher ratio of future claims to present claims than would be found for H-W. **(Id. at 6.)**

**c. Paragraph 193**. The reference to "$31.7 million" in paragraph 193 is hereby deleted and hereby replaced with "$35.5 million. Paragraph 193 now reads in full as follows:

193. The APG Silica Trust will be liable for all APG Silica Trust Claims and APG Silica Demands that are channeled by the APG Silica Channeling Injunction to the APG Silica Trust. The GIT Plan contemplates (and it is a condition to the occurrence of the Effective Date thereunder) that the APG Silica Channeling Injunction will be issued to assure that all APG Silica Trust Claims and APG Silica Demands are channeled exclusively to the APG Silica Trust. The assets of the APG Silica Trust will consist of rights to receive approximately $35.5 million in insurance settlement proceeds, and the assignment of the APG Silica Trust Policy Rights. The APG Silica Trust will process all APG Silica Trust Claims pursuant to the APG Silica TDP that are part of the GIT Plan. The GIT Plan, through the APG Silica Trust Agreement and the APG Silica TDP, has established structures to process APG Silica Trust Claims according to specific disease and exposure criteria, and all APG Silica Trust Claims will be resolved and paid pursuant to and in accordance with the APG Silica TDP. Separate disease levels are set forth in the APG Silica TDP, all with separately scheduled values and exposure, occupational, and medical criteria. **(Id., ¶ 24.)**

The citation "**(Id., ¶ 24.)**" included at the end of paragraph 193, refers to the Pahigian Declaration as cited fully in paragraph 190 of the Findings of Fact and Conclusion of Law.

**d. Paragraph 203.** The reference to "June 30, 2000" in Paragraph 203 is hereby deleted and replaced with "February 14, 2002, the Petition Date." Paragraph 203 now reads in full as follows:

> 203. Channeling the APG Silica Claims and all future APG Silica Demands in connection with first exposures through February 14, 2002, the Petition Date, to the APG Silica Trust, along with the related APG Silica Channeling Injunction, will allow Reorganized ANH to operate without having to spend resources on defending the channeled claims and demands. **(Oct. 17, 2006, Nystrom Rept., ¶¶ 11&12)**

**e. Paragraph 206.** The cross-references to paragraphs 193 and 194 are hereby deleted and replaced with cross-references to paragraphs 204 and 205. Paragraph 206 now reads in full as follows:

> 206. APG does not have sufficient free cash flow, insurance assets or borrowing availability to discharge silica-related personal injury claims in the number and amounts described in paragraphs 204 and 205 above. **(Id., ¶ 25.)**

The citation "**(Id., ¶ 25.)**" included in the end of paragraph 206 refers to the October 17, 2006 Revised Supplemental Expert Report of Kevin Nystrom, as cited fully in paragraph 93 of the Findings of Fact and Conclusions of Law.

**2. Modifications that Update the Voting Tabulation on the GIT Plan Subsequent to the Amendment.**

**a. Paragraphs 225 and 226.** Paragraphs 225 and 226 are hereby amended so that, to each paragraph, a description of the approval and service of the Supplemental Solicitation Package for the GIT Plan. As such, paragraphs 225 and 226 are deleted and replaced in their entirety with the following:

> 225. The Disclosure Statement and Plans were distributed to all creditors and interests holders in accordance with the procedures previously approved by the Bankruptcy Court's order of January 30, 2006 approving the proposed procedures for publication, notice, solicitation and voting on

the Plan (the "Voting Procedures Order"). **(Debtors' Confirm Hrg. Ex. 8; April 14, 2006 Logan Decl., ¶¶ 6-11).** A Supplemental Solicitation Package was approved by a January 26, 2007 order of the Bankruptcy Court (the "Supplemental Solicitation Order") **[GIT Doc. No. 7073]**, and was served in accordance with the Supplemental Solicitation Order by February 2, 2007 **(Feb. 2, 2007 Cert. of Serv. by Logan & Co. [GIT Doc. No. 7117]).**

226. Additional notice of the Plan and Disclosure Statement was provided by publication as approved by the Voting Procedures Order. **(May 16, 2006 Declaration of Adam Levin [NARCO Doc. No. 4346, GIT Doc. No. 6011], ¶¶ 2-7 (hereinafter "Levin Decl.").)** Additional notice of the Supplemental Solicitation Package also was provided by publication, in accordance with the Supplemental Solicitation Order. **(Feb. 2, 2007 Cert. of Serv. by Logan & Co. [GIT Doc. No. 7117].)**

**b. Paragraph 249.** The reference to "98.94%" in Paragraph 249 is hereby deleted and replaced with "98.4%," The reference to "97.11%" is hereby deleted and replaced with "97.15%." The citation "March 9, 2007 Logan Decl., ¶ 12" is hereby added to the existing citation. Paragraph 249 now reads in full as follows:

249. The GIT Plan has been accepted by 97.77% of the holders of Claims in GIT Class 3-A (General Unsecured Claims) (holding 99.45% of the dollar value of such Claims), by 95.52% of the holders of Claims in GIT Class 4-A (APG Asbestos Trust Claims) (holding 93.71% of the dollar value of such Claims), and by 98.4% of the holders of Claims in GIT Class 5-A (APG Silica Trust Claims) (holding 97.15% of the dollar value of the holders of such Claims). **(Id., ¶ 20; Oct. 18, 2006 Logan Decl., ¶ 6; March 9, 2007 Logan Decl., ¶ 12.)**

The citation "**Id., ¶ 20**" included at the end of paragraph 249, refers to the April 14, 2006 Logan Declaration as cited fully in paragraph 248 of the Findings of Fact and Conclusion of Law.

**c. Paragraph 336(c).** The reference to "GIT Class 5-P" in paragraph 336(c) is hereby deleted and replaced with "GIT Class 5-A." Paragraph 336(c) now reads in full as follows:

336(c). In connection with voting on the prepared GIT Plan, more than 4,600 individuals voted as claimants in GIT Class 5-A affirming that they believed that they had silica personal injury claims against the Debtors. **(April 14, 2006 Logan Decl., ¶ 20.)**

- 48 -

**d. Paragraph 342(b).** Paragraph 342(b) is hereby deleted and replaced with the following:

> 342(b). Of the votes cast in GIT Class 5-A, 98.4% (in number) and 97.15% (in amount of claims held) voted in favor of the GIT Plan. **(March 9, 2007 Logan Declaration [GIT Doc. No. 7184], ¶ 12).**

**3. Modification that Clarifies Issues Relating to the APG Silica Channeling Injunction.**

**a. Paragraph 350.** The reference to "$31.7 million" in paragraph 350 is hereby deleted and hereby replaced with "$35.5 million. Paragraph 350 now reads in full as follows:

> 350. The APG Silica Trust will be funded with $35.5 million in proceeds from settlements with, among others, the Settling Insurers, and with an assignment of the APG Silica Trust Policy Rights.

**b. Paragraph 351.** Paragraph 351 is hereby deleted and replaced with the following:

> 351. The APG Silica Trust and Silica Channeling Injunction are appropriate and necessary for successful reorganization of GIT under Sections 105(a) and 1123(b)(6) of the Bankruptcy Code. The classification of claimants contained in the Amendment is reasonable and the standards of Section 1122 of the Bankruptcy Code are met.

**4. Additional Conclusions of Law Relating to Certain Insurance Settlements by Certain of the GIT Debtors.** The following Conclusions of Law, which relate to certain insurance settlements by certain of the GIT Debtors, are added to the Conclusions already set forth:

> 368. In light of the direct and indirect benefits provided, or to be provided, to the APG Asbestos Trust and the APG Silica Trust by or on behalf of the APG Services Settled Insurers, the identification of the APG Services Settled Insurers in the GIT Channeling Injunction is fair and equitable with respect to any person that might subsequently assert APG Asbestos Trust Claims, APG Asbestos Demands, APG Silica Trust Claims or APG Silica Demands against an APG Services Settled Insurer.

369. The settlement agreements between the APG Debtors and APG Services Settled Insurers, as well as the payments to be made by the APG Services Settled Insurers under such settlement agreements, constitute a reasonable settlement and fair resolution of the APG Services Settled Insurers' alleged liability under the APG Services Settled Policies for the APG Asbestos Trust Claims, APG Asbestos Demands, APG Silica Trust Claims and APG Silica Demands, and such payments satisfy the liability, if any, of the APG Services Settled Insurers for such claims and demands under the APG Services Settled Policies.

370. The contributions to be made by the APG Services Settled Insurers to the APG Asbestos Trust and/or the APG Silica Trust are substantial and are a fundamental, integral and essential component of the reorganization of GIT and the GIT-Affiliated Debtors.

371. The GIT Channeling Injunction, as applied to APG Asbestos Trust Claims, APG Asbestos Demands, APG Silica Trust Claims and APG Silica Demands against the APG Services Settled Insurers, is essential and necessary to the reorganization of GIT and the GIT-Affiliated Debtors because, among other reasons, the APG Services Settled Insurers would not be willing to make their contributions to the APG Asbestos Trust and/or the APG Silica Trust without the protection provided by the GIT Channeling Injunction.

372. In view of the substantial contributions to the APG Asbestos Trust and/or the APG Silica Trust made by or on behalf of the APG Services Settled Insurers, it is reasonable and fair for the GIT Plan to provide that holders of APG Asbestos Trust Claims, APG Asbestos Demands, APG Silica Trust Claims and APG Silica Demands be enjoined from pursuing any action against the APG Services Settled Insurers in connection with the APG Services Settled Policies.

373. In light of the direct and indirect benefits provided, or to be provided, to the APG Asbestos Trust and/or the APG Silica Trust by or on behalf of Travelers (as defined in Exhibit A to Exhibit 1 of the Disclosure Statement, which has been incorporated by reference in the GIT Plan), the identification of Travelers in the GIT Channeling Injunction is fair and equitable with respect to any person that might subsequently assert APG Asbestos Claims, APG Asbestos Demands, APG Silica Trust Claims or APG Silica Demands against Travelers.

374. The settlement agreement between A.P. Green (as defined in the settlement agreement dated December 15, 2006 [GIT Doc. No. 6967]) and Travelers, as well as the payments to be made by Travelers under the settlement agreement, constitute a reasonable settlement and fair resolution of Travelers' alleged liability under the Travelers policies listed in Exhibit GIT E-2 to the GIT Plan (the "Travelers Policies") for the APG Asbestos Trust Claims, APG Asbestos Demands, APG Silica Trust Claims and APG Silica Demands, and such payments satisfy the liability, if any, of Travelers for such claims and demands under the Travelers policies.

375. The contributions to be made by Travelers to the APG Asbestos Trust and/or the APG Silica Trust are substantial and are a fundamental,

integral and essential component of the reorganization of GIT and the GIT-Affiliated Debtors.

376. The GIT Channeling Injunction, as applied to APG Asbestos Trust Claims, APG Asbestos Demands, APG Silica Trust Claims and APG Silica Demands against Travelers, is essential and necessary to the reorganization of GIT and the GIT-Affiliated Debtors because, among other reasons, Travelers would not be willing to make its contribution to the APG Asbestos Trust and/or the APG Silica Trust without the protection provided by the GIT Channeling Injunction.

377. In view of the contributions to the APG Asbestos Trust and/or the APG Silica Trust made by Travelers, it is reasonable and fair for the GIT Plan to provide that holders of APG Asbestos Trust Claims, APG Asbestos Demands, APG Silica Trust Claims and APG Silica Demands be enjoined from pursuing any action against Travelers in connection with the Travelers Policies.

**5. Adoption of Certain Findings of Fact and Conclusions of Law Without Modification.** All other paragraphs in GIT Doc. No. 6874, i.e., paragraphs **2 to 112, 114 to 192, 194 to 202, 204 to 205, 207 to 224, 227 to 248, 250 to 336(b), 337 to 342(a), 343 to 349, and 352 to 367,** are adopted without change.[140]

**VI.    <u>Conclusion</u>**

For the reasons stated above, the objections of the Objecting Insurers are overruled. Debtors' Proposed Findings of Fact and Conclusions of Law, subject to the modifications listed above, are adopted by this court. The court finds that the Debtors' Plans of Reorganization, constituted as follows, are confirmable under 11 U.S.C. § 1129:

A.    The Third Amended Plan of Reorganization dated December 28, 2005 of North American Refractories Company, *et al.*, as amended, modified, or supplemented by:

---

[140] For ease of reference, all Findings of Fact and Conclusions of Law adopted by this court, whether unchanged from Debtors' submission or amended, are attached as "Exhibit 1" to this Revised Memorandum Opinion.

1.    Modification to the Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries filed June 21, 2006;

2.    Proposed Directors, Trustees and Trust Advisory Committee Members filed June 21, 2006;

3.    Notice of Proposed Initial Trustees filed May 17, 2007;

4.    Supplement to North American Refractories Company, *et al.* Protected Parties filed October 1, 2007; and

5.    October 25, 2007 Technical Amendments to Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries filed October 25, 2007;

and

B.    The Third Amended Plan of Reorganization dated December 28, 2005 of Global Industrial Technologies, Inc., *et al.*, as amended, modified, or supplemented by:

1.    Modification to the Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries filed June 21, 2006;

2.    Proposed Directors, Trustees and Trust Advisory Committee Members filed June 21, 2006;

3.    Amendment dated December 15, 2006 to Third Amended Plan of Reorganization Dated December 28, 2005 of Global Industrial Technologies, Inc. and its subsidiaries filed December 15, 2006;

4.    Amendment to Third Amended Plan of Reorganization of Global Industrial Technologies, Inc. and Its Subsidiaries filed January 30, 2007;

5.    Supplement to Global Industrial Technologies, Inc., *et al.* Protected Parties filed October 1, 2007; and

6.    October 25, 2007 Technical Amendments to Third Amended Plans of Reorganization Dated December 28, 2005 of North American Refractories Company and Its Subsidiaries and Global Industrial Technologies, Inc. and Its Subsidiaries filed October 25, 2007

(collectively the "Plans"). The court further finds that injunctions should issue under §524(g) regarding asbestos personal injury claims and demands as defined in the Plans and under §105 and §1123(b)(6) regarding the Silica Trust claims and demands as defined in the GIT Plan.

To the extent the rulings are based on issues that are non-core, this Opinion constitutes this court's recommendations to the United States District Court for the Western District of Pennsylvania for its final determination.[141] An appropriate order confirming the Plans of Reorganization will be issued.

Counsel for Debtor(s) shall immediately serve a copy of this Memorandum Opinion on all parties on the current Service List and any other parties in interest and shall file proof of service forthwith.

DATE:  November 13, 2007

Judith K. Fitzgerald
United States Bankruptcy Judge

cjs

---

[141] See *In re Combustion Engineering*, 295 B.R. 459, 488 (Bankr. D. Del. 2003), *rev 'd on other grounds*, 391 F.3d 190 (3d Cir. 2004).